[No. 134. Decided November 13, 1891.]

# THE STATE OF WASHINGTON, *Respondent*, v. DOMINICO COELLA, *Appellant*.

MURDER—JURY—IMPEACHING WITNESS—EVIDENCE—CONFESSIONS—ARGUMENT—INSTRUCTIONS—MISCONDUCT OF JUDGE.

Under Code 1881, §§ 212 and 1078, the former employer of a decedent is disqualified as a juror in a trial for his murder.

Where a juror called in a murder trial testifies that he has formed and expressed an opinion which would require evidence to remove, but that he would try the case on the evidence and the law, he is disqualified upon the ground of actual bias, as it cannot be inferred from such testimony that he would disregard the opinion he had formed.

A witness may be asked on cross-examination for the purpose of impeaching her credibility, whether she is a prostitute, and it is error for the court to sustain an objection thereto, unless the witne s claims the privilege of refusing to answer on the ground of criminating herself.

A witness testified in a murder trial that defendant said that "unless some one paid him he would take his life," and added, "I often thought of what he said at the saloon, and one day, while in my room, I said to myself, 'My God! He said he would kill that man, and he did it:'" *Held*, Incompetent, as expressing the witness' opinion of defendant's guilt.

Where a witness has denied having a conversation with certain persons, in which he refused to tell where defendant was concealed for fear defendant would kill him if he told, it is incompetent, as being hearsay evidence, to allow such persons to testify that the witness said "he could not tell us where the defendant was, for the Italians who were the friends of defendant would kill him."

Where a defendant, after having been shot down by the officers sent to arrest him, but apparently ignorant of the fact that they were officers, and without any threats being made against him, makes confession that he killed decedent, the confession is a voluntary one and admissible in evidence.

Evidence is admissible in a murder trial to show that a third party had told defendant that the decedent threatened to kill defendant, if he kept on talking about his owing him money, as a circumstance tending to show the danger defendant believed himself to be in at the time of the murder.

It is in the discretion of the trial court to exclude the jury during the argument of counsel upon instructions asked as the law of the case, and the sending the jury from the room at such time, while the trial is in progress, does not violate the constitutional provision (art. 1, § 22) that in criminal prosecutions defendants shall have a public trial by an impartial jury.

In charging the jury in a trial for murder the court should, if so requested, define the terms "malice" and "premeditation" employed by him in stating the statutory requisites constituting murder and manslaughter.

The reading of a newspaper by the judge while the defendant in a murder trial is on the witness stand, and familiar and pleasant conversation by the judge with a witness whom the defendant's attorney was trying to impeach, is such misconduct on the part of the judge as to entitle the defendant to a new trial.

*Appeal from Superior Court, Jefferson County.*

The facts in this case are stated in the opinion.

*John Fairfield, Daniel Kelleher,* and *G. Meade Emory,* for appellant:

It was error to exclude the question, "Are you not a prostitute?" Even if the witness claimed a privilege, the question should have been allowed. 1 Greenl. Ev. (4th ed.), § 445; Starkie, Ev. 170; *Hall v. State,* 40 Ala. 699; *Com. v. Shaw,* 4 Cush. 594; 50 Am. Dec. 813. All the authorities hold that such a privilege, if any, is purely personal with the witness, and may be waived by the witness if he does not claim it himself. 1 Thomp. Trials, § 307; 1 Greenl. Ev., § 451; Whart. Crim. Ev., § 465; *Clark v. Reese,* 35 Cal. 89; *Short v. State,* 4 Har. (Del.) 568; *Sodusky v. McGee,* 5 J. J. Marsh. 621; *State v. Wentworth,* 65 Me. 234; 20 Am. Rep. 688; *Roddy v. Finnegan,* 43 Md. 490; *State v. Bilansky,* 3 Minn. 246; *Newcomb v. State,* 37 Miss. 383; *Fries v. Burgler,* 7 Halst. 79; 21 Am. Dec. 52; *Pickard v. Collins,* 23 Barb. 444; *Southard v. Rexford,* 6 Cow. 254.

It was error to refuse to strike out what Miller said to himself, viz.: " My God! He said he would kill that man,

and he has done it." *People v. Griffin*, 52 Cal. 616.

The court erred in admitting the testimony of the witness Jones as to the confession of the defendant. All the surrounding circumstances make the confession unreliable and inadmissible. 1 Greenl. Ev., § 218; *People v. Gelabert*, 39 Cal. 663; *People v. McMahon*, 15 N. Y. 384; *Cook v. State*, 22 Tex. App. 511; *People v. Mondon*, 103 N. Y. 211; 57 Am. Rep. 709; *State v. Revels*, 34 La. Ann. 381; 44 Am. Rep. 436; *Nolen v. State*, 14 Tex. App. 474; 46 Am. Rep. 247; *Wilson v. State* 84 Ala. 426. Confessions are *prima facie* involuntary and inadmissible. *People v. Rodriguez*, 10 Cal. 50; *People v. Ah How*, 34 Cal. 218; *People v. Gelabert*, 39 Cal. 663; *Biscoe v. State*, 67 Md. 6.

It was error to allow the question put to Jones, "What was said by Deleo to you about Coella?" It was inadmissible, the conversation being in the absence of defendant. *People v. Griffin*, 52 Cal. 616. It was not competent under any circumstances to thus impeach the testimony of Deleo. 1 Thomp. Trials, § 469; *People v. Butler*, 8 Cal. 441; *People v. Devine*, 44 Cal. 452; *People v. Furtado*, 57 Cal. 345; *Harris v. Wilson*, 7 Wend. 57; *Carpenter v. Ward*, 30 N. Y. 243; *Plato v. Reynolds*, 27 N. Y. 586; *Stokes v. People*, 53 N. Y. 164; 13 Am. Rep. 492; *People v. Walcott*, 51 Mich. 612; *Com. v. Buzzell*, 16 Pick. 157; *Howard v. City Fire Ins. Co.*, 4 Denio, 502.

Independent of any statute, the counsel for defendant has the right to argue the law to the jury as well as to the court. *Word v. Com.*, 3 Leigh, 743; *Com. v. Porter*, 10 Met. 263; *State v. Snow*, 18 Me. 346; *Stout v. State*, 96 Ind. 407; *Heagy v. State*, 85 Ind. 260; *Hannah v. State*, 11 Lea. (Tenn.) 201; *State v. Miller*, 75 N. C. 73; *Adams v. People*, 47 Ill. 376; *State v. Saliba*, 18 La. Ann. 35; *State v. Thomas*, 47 Conn. 546; 36 Am. Rep. 98; *State v. Croteau*, 23 Vt. 14; 54 Am. Dec. 90; *Kane v. Com.*, 89 Pa. St. 522;

33 Am. Rep. 787; *Com. v. Austin*, 7 Gray, 51; *Johnson v. State*, 59 Ga. 142.

*R. E. Moody*, Prosecuting Attorney, for The State:

E. T. Biggs was competent as a juror. Code 1881, § 1082; *White v. Territory*, 3 Wash. T. 397; *Dolan v. State*, 40 Ark. 454; *Casey v. State*, 37 Ark. 67; *Benton v. State*, 30 Ark. 328.

The testimony shows that the confession made by the defendant was voluntary and that the confession was not made under the influence of fear produced by threats. Code 1881, § 1070; Greenl. Ev., § 219; *State v. Moorman*, 27 S. C. 22; *People v. McCullough*, 81 Mich. 25; *Territory v. McGrath*, 5 Utah, 525. Confessions presumed to be voluntary unless the contrary is shown, or something appears in the confession or its attendant circumstances to combat such presumption. *State v. Meyers*, 99 Mo. 107; *People v. Barker*, 60 Mich. 277; 1 Am. St. Rep. 501. It is not sufficient to exclude a confession by a prisoner that he was under arrest at the time, or that it was made to the officer in whose custody he was, or in answer to questions put by him. *Cox v. People*, 80 N. Y. 500; *State v. Tatro*, 50 Vt. 483; *Redd v. State*, 68 Ala. 492; *Spicer v. State*, 69 Ala. 159; *Jackson v. State*, 69 Ala. 251; *People v. Chapleau*, 121 N. Y. 266; *Com. v. Smith*, 119 Mass. 305; *Com. v. Mitchell*, 117 Mass. 431; *Com. v. Preece*, 140 Mass. 267; *State v. Carlisle*, 57 Mo. 102.

The answer of the witess Jones to the question "What was said by Deleo to you about Coella?" was admissible, Deleo having testified in regard to the conversation. *Seller v. Jenkins*, 97 Ind. 430.

The court may or may not at his discretion exclude the jury during the argument of law to the court by counsel on any question. 1 Thomp. Trials, § 945; *Winter v. Bandel*, 30 Ark. 363.

The opinion of the court was delivered by

Scott, J.—Defendant was convicted of murder in the first degree, for the killing of one John Deletis, and was sentenced to be hanged. He appealed the case, and seeks a reversal for various reasons, among which are the following: That error was committed in the selection of the jury which tried him. After all of the defendant's peremptory challenges were exhausted, one E. T. Biggs was called as a juror, and, in answer to questions put to him, testified:—

"I reside in Port Townsend. Was acquainted with deceased. He was in my employ. Heard and read of case in newspaper. Was so horrified at the murder that it made me sick. Have formed and expressed an opinion which would require evidence to remove. Would try the case on the evidence and the law."

This juror was challenged for cause by the defendant, which the court overruled, and an exception was taken. The challenge should have been granted. In a civil action between Deletis and defendant, Biggs would have been disqualified as a juror for implied bias, under code, § 212, he and Deletis standing in the relation of master and servant; and while, of course, the deceased could not be a party to the prosecution, yet, for the purpose of impaneling a jury he should be considered as an adverse party to the defendant. If the feelings supposed to be engendered by this relationship, or the influence that it might exert, are grounds of disqualification in a civil cause, it goes without saying that the reasons apply with much more force in a case like this. Code, § 1078, provides that the law relating to the drawing, retaining, and selection of jurors in civil cases shall apply to criminal cases as well.

The challenge should have been allowed, also, upon the ground of actual bias. Biggs' testimony is hereinbefore given in full as it appears in the record. He did not testify that he could disregard the opinion he had formed, and

his statement that he would try the case upon the evidence and the law does not amount to this. His examination, apparently, was hasty and insufficient, and his testimony is very unsatisfactory to show his ability to give the defendant a fair and impartial trial; nor is it stated in the record that the court found that he could do so, although we might be bound to presume this from the fact that the judge allowed him to sit as a juror. It was contended, however, that the juror's own opinion as to his fitness determined his qualification in this particular. Code, §§ 211, 213, civil practice act, read as follows:

"Sec. 211. Particular causes of challenge are of two kinds: (1) For such a bias as, when the existence of the facts is ascertained, in judgment of law disqualifies the juror, and which is known in this code as 'implied bias;' (2) for the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the trier, in the exercise of a sound discretion, that he cannot try the issues impartially and without prejudice to the substantial rights of the party challenging, and which is known in this code as 'actual bias.'"

"Sec. 213. A challenge for actual bias may be taken for the cause mentioned in the second subdivision of section two hundred and eleven. But on the trial of such challenge, although it should appear that the juror challenged has formed or expressed an opinion upon what he may have heard or read, such opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially."

And § 1082, criminal practice act, provides that "challenges for cause shall be allowed for such cause as the court may,in its discretion,deem sufficient,having reference to the causes of challenge prescribed in civil cases as far as they may be applicable, and to the substantial rights of the defendant." We are not called upon, in this case, to decide whether we would go into the question of fact to determine

a juror's competency in this particular, where the judge finds that such juror could try the issue between the state and the defendant impartially, and where there is evidence which tends to support such a finding, for in this instance there was no testimony upon which the judge could so find. From the juror's own statement, it appears that he entered upon the trial with a fixed opinion, which he did not even say he could regard. True, he said he would try the case upon the law and the evidence, but the only reasonable interpretation that can be given to his testimony, under the circumstances, is that he would, to some extent, be influenced by his opinion already formed. Had the juror testified that he could give the defendant a fair trial, the judge, of course, would not be bound thereby to find accordingly, and certainly ought not to do so if it should appear to him otherwise from all the evidence offered. He should attach such weight only as he should deem proper, under all the circumstances, to such an opinion of the juror. A statement by a juror, however, that he could not try the issue impartially, would be entitled to much greater weight, if not required to be taken as conclusive.

One Gabrielle Monard was called and examined as a witness for the prosecution. Upon cross-examination, she testified that she was a married woman, whereupon defendant's attorney asked her a further question, as to whether she was not a prostitute. The prosecuting attorney objected to this question, which objection the court sustained, and an exception was taken. This was error also. The witness could have refused to answer the question upon the ground that it would tend to criminate her, as she could not be compelled to answer questions when such answers would furnish evidence to convict her of a criminal offense; but the law is well settled that this is a personal privilege, which the witness need not have availed herself of unless she desired to do so. Otherwise the question

was competent, its office being to bring out a fact which would degrade the witness, thereby affecting her credibility. If she chose to answer and admit, if such was the fact, that she had wantonly violated the restraints and passed outside the limits which religion, society and the law have long established for woman's welfare and protection, her testimony would have been very seriously impaired. She could not have ruthlessly destroyed that quality upon which most other good qualities are dependent, and for which, above all others, a woman is reverenced and respected, and yet retain her credit for truthfulness unsmirched; but the fact that she could have declined to answer the question furnished no ground for an objection thereto by the prosecution. The record does not show that the witness claimed any exemption, and in the absence thereof, the objection should have been overruled. However, the court should have informed her of her option in the premises, so that she might not, through ignorance, lose her right.

One John Miller was a witness for the prosecution, and testified as follows:

"I have lived here about two years. I was a bartender. I don't do anything at present. I did work at the Louvre saloon. I know defendant. He used to come to the saloon now and then. In May or June defendant was in the saloon with five or six others, drinking. They were all Italians. I heard defendant say, 'If my partner don't pay me what he owes me I will take his life.' They were all talking and drinking. It was between 4 and 6 o'clock."

Cross-examination:

"I am a Spaniard. Was born at Montevideo. Left there about three years ago. I speak Spanish and English. I understand Italian a little. I don't read or write it. I first communicated what I heard in the saloon to Delany, three or four days ago. He said if his partner did not pay him he would take his life. This was said in Italian. Coella had been drinking. I had talked with defendant a few

times before.    I heard him say he would take his partner's life.

" Q. Are you positive that Coella threatened to take some one's life, and that he so stated in Italian ?    A.  Yes, I am.

" Q. Will you please tell the jury what the word 'partner' is in the Italian language?  A.  I don't know.

" Q. Why did you say that the defendant made use of that word?  A.  I did not say so.   I said that Coella said unless some one paid him what he owed him he would take his life.   I was drawing beer when he used these words.   My back was turned to him.   I knew he said it because I recognized his voice.   I never heard him talk before that day when he was drunk.   I often thought of what he said at the saloon, and one day, while in my room, I said to myself, 'My God! He said he would kill that man, and he did it.'"

The defendant objected to this last statement as to what the witness said to himself in his room, and moved the court to strike it out.    The motion was denied, and exception was taken.    It is difficult to understand why the court refused to strike this part of the witness' testimony. It does not appear to have been called for, or given in response to any question asked by the defendant's attorney, and it was clearly incompetent, and of a most dangerous character.    From the previous testimony of the witness, there is some doubt as to whom Coella referred to when he said that unless some one paid him he would take his life, if he did so say; but in the statement objected to, the witness applies it unqualifiedly as being to the deceased; and, in any event, it amounted to allowing the witness, practically, to tell the jury that in his opinion the defendant was guilty.    It was too palpable a violation of elementary law to admit of much discussion.

Michael Deleo, a witness for the defense, testified to the good reputation of the defendant—as to his being a quiet and peaceable man.    On cross-examination his testimony was as follows:

"Don't remember talking to Jones or Delaney."

"Q. Did you not tell Jones or Delaney that Coella would kill you if you told where he was?"

An objection to the question was made and overruled.
"A. Never had any such conversation, but said that I did not know where he was."

W. J. Jones was recalled by the prosecution as a witness on rebuttal, and the following question was asked him on his direct examination, to wit:

"What was said by Deleo to you about Coella?"

The defendent interposed an objection, which was overruled, and the witness, answering, said:

"He said he could not tell us where Coella was, for the Italians who were the friends of Coella would kill him.

The defendant moved to strike out this answer on the grounds that it was incompetent, irrelevant, and immaterial, and because the statement was not made by Deleo in the presence of the defendant, and he argues that it was intended to create a prejudice in the minds of the jury against Italians generally, thus injuring the defendant, who was of that nationality. The motion was denied, and an exception was taken. Thomas Delaney was also called, and asked the same question, in substance, by the prosecution. He answered that Deleo said he did not know where Coella was, and if he did he would not tell, because the Italians would kill him. The same objection and motion were made thereto by the defendant, and the same ruling had. The testimony of Jones and Delaney in this particular was incompetent, and it was clearly hearsay, and no foundation had been laid for its introduction in the way of an impeachment of Deleo, if it could have been so admissible.

Several witnesses for the prosecution testified to a confession by the defendant that he killed the deceased. This testimony was objected to on the ground that such confession was inadmissible under the circumstances which sur-

rounded the defendant at the time it was given. W. J. Jones, when first on the stand as a witness for the prosecution, testified in part as follows:

"I am a deputy sheriff in Jefferson county. Delaney, Kunkler and I found the defendant on the road near the race track, which is about two or three miles from the city. It was the night of the 28th of July. We were in search of the defendant. We expected him to pass where we were concealed. The night was foggy and cloudy. We were lying behind a log. At about 2 o'clock we saw two men coming towards the town. Delaney said, 'Here he comes.' Delaney said, 'Smith, hold up your hands.' Smith dropped his bundle, raised his gun, and fired. We returned fire, firing three shots at him. He fell towards us, face downwards, and cried out, 'You have killed me.' The defendant was known as Smith. I then walked away from Kunkler and Delaney, and went around by the side of defendant; took hold of him by the hand. Delaney then came up. Defendant then said, 'Mr. Tommy, you have killed me.' Found that defendant was shot in the leg. He asked me to send for a priest. I asked him if he killed Deletis. (Objected to by defendant. Objection overruled, and exception taken.) He said, 'I killed him.'"

"Question by prosecuting attorney: 'Now state all the defendant said and did at that time.' (The defense objected to the testimony of any confession made at that time, and under the circumstances that then surrounded the defendant, which was overruled, and excepted to.) A. The defendant said: 'I don't want to tell any lie. I hit him on the head, and cut him three times.' I asked him why he killed him. He said he would tell the truth. He said he asked him for $400. Deletis said he would give him no money, and then Deletis called him a son of b——h. He said: 'That made me crazy, and I struck him. I could find no money in the trunk. I took $15.65 out of the drawer, and my clothes I took out of trunk. I cut my thumb when I was cutting him. I expected to get away to-night on the boat. I was going to black with cork.' I asked him why he fired at us. He said: 'Kill one man, kill two men, hang all the same.' He said he thought he

was killed. Wanted a priest. He said he knew he was going to die. He asked Delaney to shoot him. He had palpitation of the heart, and talked very slow. 'I knew you kill me. I'll tell the truth, Mr. Tommy. Oh, you kill me, you kill me!'"

Section 1070 of the 1881 code provides that "the confession of a defendant made under inducement, with all the circumstances, may be given as evidence against him, except when made under the influence of fear produced by threats; but a confession made under inducement is not sufficient to warrant a conviction without corroborating testimony." The objections made to this testimony were properly overruled, even though they should be regarded as sufficient to raise the question under the exception in the above statute. No doubt the defendant was laboring under a sense of fear at the time, and of a most serious character, owing to the way in which he was surprised, and to the wound he had received. The conduct of the officers in capturing the defendant, as it appears from the record, was unwarranted. At midnight, while proceeding along the highway, the defendant is suddenly commanded by men in ambush to throw up his hands, without so much as calling to him that they were officers and wanted to arrest him. It is not at all strange that in the excitement of the moment he should think he was attacked, and undertake to defend himself. Without anything more being said, the officers opened fire and shot him down. It does not appear that the defendant at any time during the affair knew or was told that they were officers, or that they formally arrested him, or even told him what they wanted of him or intended to do with him. The circumstances were such as were well calculated to produce fear of a most grievous nature—that of death itself—in the mind of any man. But can it be said that it was of a character likely to lead the defendant to confess guilt? Certainly it cannot be claimed that he

did so under the influence of fear produced by threats, for
it does not appear that he was threatened in any way with
reference thereto, or at all, nor that he understood that
his safety depended in any wise upon his giving an affirma-
tive answer to the question put to him.   Doubtless he was
in a condition of mind where he could not be expected to
act with any great degree of reason, or to consider well
what he was saying; yet this, of itself, would not be suffi-
cient to warrant the exclusion of this testimony.   Many of
the authorities cited by appellant upon the subject of con-
fessions do not apply here, in consequence of our statute.
The only case upon a similar statutory provision in this
particular submitted to us is that of *People v. Mondon*, 103
N. Y. 211; 57 Am. Rep. 709.   The law there provided that
" a confession of a defendant, whether in the course of judi-
cial proceedings or to a private person, can be given in evi-
dence against him, unless made under the influence of fear
produced by threats, or unless made upon a stipulation of
the district attorney that he shall not be prosecuted there-
for."   In that case, after the defendant had been arrested
for the murder, the coroner held an inquest, and the defend-
ant was summoned as a witness, and examined on oath as
to circumstances tending to connect him with the crime.
He was unattended by counsel, and it did not appear that
he was in any manner informed of his rights, or that he
was not bound to answer questions tending to criminate
him.   His statements were reduced to writing and read
over to him by the coroner, and he admitted them to be
true.   However, the coroner was not satisfied that the defend-
ant, who was a foreigner, understood English well enough
to be examined, and subsequently had his testimony read
over to him by an interpreter, and the defendant made no
corrections or suggestions.   His statements so obtained
were admitted in evidence upon his trial, and this was held
to be error, the court laying great stress upon the fact

that they were obtained in an examination under oath before a magistrate, before whom the defendant was taken involuntarily, and interrogated by the magistrate, who, to all appearances, had power to require him to answer, and that the evidence so obtained was not a confession, or at least not a voluntary one, but was an official examination of the prisoner, on oath, while in custody, in which, while he admitted some facts in regard to the relations between him and the deceased, he denied all knowledge of the crime.

There is a well-defined distinction between the admissions of the defendant in that case, who evidently intended to confess no guilt, and the direct confession of guilt by the defendant in this case, if he did so confess. The former was more in the nature of an acquiescence in the statement read to him by the interpreter, when the defendant said nothing, for he cannot be said to have understood it before then, under the testimony; and this, taken in connection with the fact that he denied all knowledge of the crime, rendered those admissions more particularly of a class that should be received with caution, under the general rule laid down by some of the text-writers, owing to the danger of mistake, and of the failure of the party to express his own meaning, etc. See 1 Greenl. Evidence, §§ 170–199, 214. While this might be said to apply more properly to the force that should be given them after admission, yet it should also have some bearing upon the question of admissibility where the fact is determined by the judge, in the first instance, upon objection being made. In the present case it did not appear that the confession was an involuntary one, and the action of the court in overruling the objections and admitting the testimony for consideration by the jury was right.

While the defendant was on the stand his attorney asked him the following question:

" Did any person other than Chehalis ever say anything

to you about any conversation they had with Deletis about you?"

An objection was made and sustained; whereupon an offer was made upon the part of the defendant to prove by him that one Grossa had told the defendant, in June, 1890, that Deletis said:

"If Coella keeps on talking about my owing him money I will kill him."

The court refused to allow the testimony to be given, and an exception was taken. Deletis was killed by the defendant, July 3, 1890. The defendant denied having made the confession given in evidence against him, and claimed that, upon his asking Deletis for a sum of money that was due him, Deletis violently attacked him, and that he was compelled to kill him in self-defense in the altercation which ensued, detailing what he claimed to have been the circumstances. Grossa had gone to Italy some time previous to the trial, and the defendant had applied for a continuance in order to get his testimony, which the court, deeming the showing therefor insufficient, refused to allow. This testimony should have been admitted. It was a circumstance to be considered in connection with the attack which he claimed was made upon him by the deceased, not as any evidence of the attack, but as likely to have had some effect upon and tending to show the condition of his mind when attacked as to the danger he was in, or believed himself to be in. For this purpose it was not subject to the rule excluding hearsay testimony, and it made no difference whether deceased had, in fact, told Grossa anything of the kind or not—the important thing was whether Grossa had so told the defendant.

At the close of the testimony the defendant's attorney submitted a number of instructions which he desired given to the jury, and he proceeded to read authorities in support thereof, whereupon the court ruled that the jury be excluded

during the argument upon the instructions, to which the defendant excepted, and assigns it as error. He insists that he had a right to have the jury present, and to read the cases and argue the law upon the instructions he desired to be given in their hearing. He calls our attention to § 22, art. 1 of our state constitution, which provides that in criminal prosecutions defendants shall have a speedy public trial by an impartial jury, and to subdivision 5 of § 221 of the code, which is as follows:

" After the conclusion of the evidence, and the filing of request for charge in writing or instructions, the plaintiff or party having the burden of proof may, by himself or one counsel, address the court and jury upon the law and facts of the case, after which the adverse party may address the court and jury in like manner by himself and one counsel, or by two counsel, and be followed by the party or counsel of the party first addressing the court. No more than two speeches on behalf of plaintiff or defendant shall be allowed."

He argues that the constitutional provision is violated by sending the jury out of the room while the trial is in progress, and that the argument upon the instructions is a part of the trial, and that, if there was any doubt about his right to have the jury present under the constitutional provision, the above subdivision of § 221 would render the matter certain. Although the argument and reading of authorities to the court upon request to charge may be said to be a part of the trial, yet it is not so within the spirit of the constitutional provision referred to, under our practice, so far as having the jury present is concerned. It would be optional with the court as to hearing any argument upon the law; 'but unless there was no contest between the parties as to the law applicable to the case, and the judge should intend to charge the jury as requested, as a matter of caution, that he might make no mistake, thereby occasioning extra expense, or possibly resulting in much

more serious consequences, and in deference to a member
of his court learned in the law, and entertaining a different
view from that of the judge as to the law applicable to the
particular case, even as a matter of courtesy always due
from the bench to the bar, he would hear counsel reason-
ably in an argument thereon, unless, indeed, he should be
very certain as to the legal principles involved, and as to
his ability to properly express them to the jury unaided.
It would be a very hazardous course to pursue, at best, to
refuse to hear argument, for counsel ordinarily give to a
case, especially if it be one of the gravest importance, much
more time and attention than the judge can possibly give.
We are constrained to make these remarks because, in this
case, the judge, after ruling that the jury be excluded,
further ruled that he would hear no argument upon the
law, but said counsel could submit their authorities, which
he would examine.    However, if the law is properly laid
down by the judge that is the end of it, so far as this
matter is concerned; nor does the fact that a party has the
right to argue the law to the jury of itself necessarily carry
with it the right to read to them from the books in all in-
stances.    Many of the cases cited by counsel do not apply
here, because they arose in those states wherein juries in
criminal causes are judges of the law as well as of the facts.
Although under our practice juries only pass upon ques-
tions of fact, and take the law as laid down to them by the
court, yet the undoubted right to argue the law to the
jury exists, as the charge is not given until the argument
is concluded.    As said by JACKSON, J., in *Ransone v.
Christian*, 56 Ga. 352:

"Counsel cannot know what the court will charge; they
cannot lay down to the jury the law as he will charge
it unless they be gifted with foreknowledge; they must,
therefore, be allowed to lay down to the jury the law which
they think the court will charge, or, in other words, their

own view of the law; and, in the light of that law, argue the facts."

As the right to argue the law to the jury exists, the court, in the exercise of a sound discretion, should allow counsel, as a part of his argument and within reasonable limits, to read law to them applicable to the case. To use the language of BARTLEY, C. J., in *Legg v. Drake,* 1 Ohio St. 286:

"While the right of a party to be heard by his counsel on the trial of his cause is not to be questioned, and is often of great service in the investigation of questions, both of law and of fact, yet, inasmuch as this privilege may be liable to abuse, to the great hindrance and annoyance of courts in the progress of business, the extent and manner of its exercise must, in some measure, rest in the sound discretion of the court. Although unlimited license in range and extent is not allowed to counsel, in their addresses to the court and jury, yet no pertinent and legitimate process of argumentation within the appropriate time allowed should be restricted or prohibited; and it is not to be denied but that a pertinent quotation or extract from a work on science or art, as well as from a classical, historical or other publication, may, by way of argument or illustration, be not only admissible, but sometimes highly proper; and it would seem to make no difference whether it was repeated by counsel from recollection, or read from a book. It would be an abuse of this privilege, however, to make it the pretense of getting improper matter before the jury as evidence in the cause."

The above was quoted with approval by WHEELER, J., in *Wade v. DeWitt,* 20 Tex. 398, who says:

"The privilege of counsel, in their address to the jury, to read from legal authorities, or from works of general science, extracts pertinent to the case, in support of their argument, ought not to be abridged. It is a valuable privilege; for, as has been well said, 'an able and diligent advocate could scarcely sum up a case of any magnitude without repeating, either from memory or from the books,

the principles of law bearing on the controversy, as laid down by the best authors; and where authorities are cited it is better, in order to avoid mistake, that they should be produced in court to speak for themselves than that the doctrine inculcated by them should be taken from the mouth of counsel.' 2 Gr. & Wat. on N. Trials, 685. Yet this privilege is so susceptible of abuse that the extent and manner of its exercise must be intrusted, in a great measure, to the sound discretion of the court. It is more reasonable to suppose the court will not abridge it improperly, than that the advocate, actuated by the strong desire for success and triumph over his adversary, will not abuse it. It is better for the administration of justice and the protection of the rights of parties that the exercise of this privilege should be regulated by judicial discretion, than that it be left to the unlimited discretion of counsel, governed by the powerful motives of interest and ambition. And I apprehend it would require a clear case of the abuse of judicial discretion, to the injury of the party, to authorize the reversal of a judgment for such a cause. It ought clearly to appear that the rights of the party were denied or improperly abridged by the court, to make a matter of this kind a ground of reversal."

And this is again approved in *Lott v. State*, 18 Tex. App. 627. In this case, according to the statement, counsel for defendant, in the course of his argument, when discussing the force and effect of confessions, proposed to read to the jury, as a part of his argument, §§ 214 and 215 of 1 Greenleaf on evidence, and also, in opposition to the argument of the state's counsel as to the importance of the evidence of good character, §§ 66 and 67 of Wharton's Criminal Evidence, and, upon the doctrine of the presumption of innocence, an extract from the opinion of the court of appeals in *Hampton v. State*, 1 Tex. App. 658. The district court refused to allow this to be done. Willson, J., in rendering the opinion of the court, said:

"The bill of exceptions presenting this action of the court sets forth the law which the counsel proposed to read,

and, in our opinion, it was pertinent to the case, and the
reading proposed was to be within reasonable limits.   We
think the court did not act within the bounds of a sound
discretion considering the facts of this case, in denying
counsel the privilege of reading the law he proposed to
read.   We cannot better express our opinion than by re-
ferring to and adopting the opinion of the supreme court
in *Wade v. De Witt,* 20 Tex. 398."

But it does not follow that a party has the right to have
the jury present during an argument to the court upon the
law of the case, where counsel reads his own selections, or
that it would be proper to allow the jury to remain in all
instances.   Indeed, the safer course and better practice
would be to exclude the jury.

Exceptions were taken to some of the instructions given
by the court to the jury.   A portion of one of them com-
plained of is as follows:

"The jury are instructed that, if they find from the evi-
dence beyond a reasonable doubt, that on or about the 3d
day of July, 1890, at the county of Jefferson, in the State
of Washington, the defendant, Dominico Coella, did pur-
posely and of deliberate and premeditated malice, as the
terms have been defined to you in the instructions, or in
the perpetration or attempt to perpetrate robbery or burg-
lary, kill one John Deletis, then you will find the defendant
guilty of murder in the first degree; and if you find from
the evidence, beyond all reasonable doubt, at the place
aforesaid, and at the time aforesaid, the defendant did pur-
posely and maliciously, as those terms have been defined
to you in these instructions, but without deliberation and
premeditation, kill one John Deletis," etc.

This is objected to on the ground that it was misleading
in that the court speaks of having defined certain words
therein indicated, when in fact no attempt at any definition
appears throughout the instructions.   The statutory requi-
sites to constitute murder in the first and second degrees
and manslaughter had previously been stated to the jury

by the court, but only in the language of the statute, which simply makes use of the words mentioned without defining them in any way. This is the more noticeable because part of the instructions submitted by defendant were directed to the explanations of these terms. The defendant's seventeenth request to charge was as follows:

"To kill a person with premeditated design, the mind must have acted in regard to the killing before the killing was committed, and the mind must have settled down, resolved and determined to kill and murder, and the killing done with a deliberate mind and formed design of so doing."

Some instruction upon this point should have been given, under the circumstances, although the above one should have been qualified by telling the jury that no particular length of time was required in which to form the purpose. The following are the eighteenth and nineteenth requests which the defendant submitted:

"'Premeditation' has been defined to mean a design formed to commit a crime, or to do some other thing before it is done.

"'Malice' has been defined to mean the doing of the wrongful act intentionally, without just cause or excuse. It is a wicked and mischievous purpose which characterizes the perpetration of an injurious act, without lawful excuse."

These, or something equivalent thereto, should have been given.

One of the grounds upon which the defendant's motion for a new trial was based was misconduct upon the part of the judge during the progress of the trial. It appears, by certain affidavits contained in the record, that, while the defendant was on the stand testifying, the judge engaged himself in reading a newspaper; and that, while defendant's attorney was trying to impeach the testimony of one of the witnesses for the prosecution, the judge familiarly con-

versed with said witness, and that at various times pleasant smiles passed between them; that they also passed, one to the other, candy, which was eaten while said witness' testimony was being assailed. The matters set forth in these affidavits are not contradicted or explained in any way, nor was the imputation that the affair was calculated to create an impression or prejudice in the minds of the jury unfavorable to the defendant disputed. As it is made to appear to us, these proceedings amounted to something more than undignified conduct upon the part of the judge, and would naturally impress the jury adversely to the defendant's case. These acts must have been performed by the judge without any consideration of the probable results thereof, for it cannot be presumed for a moment that he resorted to such methods, intentionally, to convey his opinion of the guilt of the prisoner to the jury, but the effect was there, nevertheless. The solemnity of the trial upon the issue of which hangs the life of a human being, wherein it is to be determined whether such life shall be taken as a just penalty to satisfy the demands of justice outraged, if so found, can scarcely be approached in any other proceeding over which human beings have control. Certainly any man connected therewith, filling an important position, in arriving at a decision therein, and fulfilling the duties of his position, would realize the awful responsibility resting upon him, and act with becoming dignity. The reading of a newspaper by the judge at the sole particular time while the defendant was upon the stand testifying, and it does not appear that he read it at any other time while the trial was in progress, would lead the jury—always quick to receive an impression from the judge, as well from his acts and manner as from what he may say—to think that the testimony being offered was untruthful or unimportant, and unworthy of their consideration. Also, the witness whose testimony the defendant sought to impeach had tes-

tified to some very material matters against him, and it was of the very highest importance to weaken this testimony if he could do so, and he was entitled to discredit it in all legitimate ways, and to the benefit and effect of all rightful matters going to impair it. The marked conduct of the judge toward this witness, at the time, must have made a decided impression upon the jury. It was substantially saying to them that the judge believed in this man and indorsed his testimony, and the jury would naturally think that, as the witness enjoyed the confidence of the judge, they should not hesitate to believe him, notwithstanding the attack made upon him by the defendant. We have a constitutional provision prohibiting judges from commenting on matters of fact to the jury. It was intended to prevent the judge from conveying to the jury his opinion upon the facts, in order that these matters might be left to the exclusive province of the jury. To allow a judge to so demean himself as to convey such information by his conduct would be more dangerous and subversive of justice than actual comments, because, ordinarily, it would be so much more difficult to get at or show forth upon the record in case of an appeal. It is to be hoped that the occcasion will not often arise.

Reversed, and remanded for a new trial.

ANDERS, C. J., and STILES and DUNBAR, JJ., concur.

HOYT, J., dissents.