[No. 23587. Department One. March 28, 1932.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM J. VAUGHN, *alias Samuel Adam Housh, Appellant.*[1]

*W. B. Mitchell,* for appellant.

*Chas. W. Greenough* and *Ralph E. Foley,* for respondent.

BEELER, J.—The defendants William J. Vaughn, whose true name is Samuel Adam Housh, and George A. Miller, were jointly charged in each of counts 1 and 2 of the information with the crime of second degree burglary, in that, on the 15th day of March, 1931, they did break and enter two railway cars, the property of the Great Northern Railway Company, while standing in its railway yards at Hillyard, Washington. In

[1]Reported in 9 P. (2d) 355.

count 3, they were charged with the crime of grand larceny, in that, on the same day, they did steal and carry away certain merchandise or property of the railway company of the value of $155.67.

On May 19, 1931, each of the defendants, being represented by their attorney, Mr. Mitchell, entered a plea of not guilty. Two days later, the defendant Miller, in the absence of his counsel, appeared in court with the prosecuting attorney, withdrew his plea of not guilty, and entered a plea of guilty, the sentence, however, being deferred until June 26 following. Miller testified as a witness on behalf of the state at the time of the trial. A verdict of guilty was returned against Housh on all three counts. June 26, both defendants were sentenced to serve a term in the state penitentiary, the sentence of the former being suspended. The defendant Housh has appealed.

From the evidence, the jury were warranted in finding these facts: That the appellant and Miller became acquainted with each other in 1928, at which time both were employed as switchmen by the Great Northern Railway Company at Hillyard, where they resided with their respective families; that, during the autumn of 1929, owing to business conditions, both Miller and the appellant were laid off by the railway company, the latter obtaining employment with the Milwaukee Railway Company as a switchman. But Miller, it appears, gained little or no employment from that time up to the time of his arrest, and his family, consisting of his wife and six children, were living under rather dire circumstances.

At about twelve o'clock noon of March 5, 1931, the appellant went to Miller's home, and there they laid plans to break into, plunder and steal merchandise from railway cars belonging to the Great Northern

Railway Company. Accordingly, about seven o'clock that evening, Miller went to the home of the appellant, and shortly thereafter they drove the latter's automobile to the Great Northern Railway yards at Hillyard, and remained seated therein for a period of about two hours and until a certain branch train which runs through Dean, a small village located several miles north of Hillyard, arrived, whereupon the appellant left the automobile and walked into the railway yards. After the train departed for Dean, Miller, in accordance with the understanding between them, drove the automobile from Hillyard to Dean and parked it underneath a viaduct near the railway depot.

Presently the appellant appeared underneath the viaduct, where Miller was waiting with the automobile, carrying merchandise consisting of cigarettes and other articles packed in boxes and sacks, and placed them in the rear seat of his car. Thereupon, they returned to the appellant's home at Hillyard, arriving there about midnight. The appellant carried the merchandise into his house and gave Miller a box of candy and four or five pounds of coffee—a portion of the loot or stolen merchandise. Some two or three days later, the appellant gave Miller the sum of twenty-one dollars, stating at the time that "this is your cut."

It further appears that the appellant told Miller, at the time they planned to plunder railway cars, that he was looking for cigarettes, as he had a place or a "fence" where he could dispose of them. While Miller and the appellant were incarcerated at the county jail, the latter stated to him that if he, Miller, would take the "rap" his family would be taken care of while he was serving time.

The foregoing facts were adduced from the testimony of Miller. In addition thereto, the jury were justified in finding that, before the train left Hillyard

on the night of March 15, the seal of the door of the Great Northern's railway car No. 18143 had been broken.

On the night of April 5, 1931, the appellant and Miller were arrested while in a field near the railway station at Dean, Washington, and were lodged in jail at Spokane the same evening. On the following morning, Miller was taken to the office of the prosecuting attorney of Spokane county, where he confessed his guilt.

The appellant first contends that he was not accorded a fair and impartial trial. In support of this contention, it is argued that the prosecuting attorney had entered into a secret understanding with Miller whereby the latter was induced to testify on behalf of the state in consideration for which he was to receive a suspended sentence.

Miller emphatically denied he had been offered any inducement to testify on behalf of the state either by the prosecuting attorney or by any of the special agents of the railway company. He testified that, of his own accord, he informed the prosecuting attorney of his connection with the commission of the various crimes alleged in the information. In any event, whether Miller made his confession under inducement, became a question of fact for the jury, which issue was submitted to them under proper instructions.

Nor do we find any merit in the contention that the prosecuting attorney was guilty of misconduct. True, at the time of his opening statement to the jury as to what the proof would show, he made some reference as to what was supposed to have taken place on the night of April 5, at the time when the appellant and Miller were placed under arrest. However, we are satisfied from a review of the record that the statements made by the public prosecutor as to what the

proof would show were made in good faith. We have uniformly held that reasonable latitude should be allowed in the making of an opening statement to a jury. *State v. Zupan,* 155 Wash. 80, 283 Pac. 671.

The appellant called Mr. Foley, the deputy prosecuting attorney who conducted the trial for the state, as a witness to prove the alleged secret agreement supposed to have been made between the prosecuting attorney and Miller as heretofore referred to. Mr. Foley, after he was examined by the appellant's counsel, stated:

"MR. FOLEY: I will ask myself a question on cross-examination. THE COURT: You needn't ask the question, Mr. Foley. MR. MITCHELL: Just wait a minute. Ask yourself the question first. A. His Honor said I didn't need to. MR. MITCHELL: Well, he has got to ask his question if he wants to answer it. I want to know what he is going to state. THE COURT: It seems to be a senseless procedure, Mr. Mitchell, to ask yourself a question. *I dare say he wouldn't answer anything that he shouldn't.* Exception." (Italics ours.)

The appellant contends that the statement of the trial court, and more especially that portion which we have italicized, was a comment upon the weight of the testimony and the credibility of the witness Foley. We are of the opinion that this contention must be sustained. Article IV, § 16 of the state constitution, reads:

"Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."

We have frequently commented upon the objects and purposes of this constitutional provision.

"The object of the constitutional provision, doubtless, is to prevent the jury from being influenced by knowledge conveyed to it by the court of what the court's opinion is on the testimony submitted. The

constitution has made the jury the sole judge of the weight of the testimony and of the credibility of the witnesses, and it is a fact well and universally known by courts and practitioners that the ordinary juror is always anxious to obtain the opinion of the court on matters which are submitted to his discretion, and that such opinion, if known to the juror, has a great influence upon the final determination of the issues. . . . There is no other constitution that we have been able to find that is as prohibitive of the action of the court in this respect as ours." *State v. Crotts,* 22 Wash. 245, 60 Pac. 403.

In *State v. Jackson,* 83 Wash. 514, 145 Pac. 470, we said:

" . . . our constitution, in so far as it declares that a judge should not comment upon the facts, is unlike the constitution of other states.

" 'There is no other constitution that we have been able to find that is as prohibitive of the action of the court in this respect as ours.' [*State v. Crotts,* 22 Wash. 245, 60 Pac. 403.]"

In the case of *State v. Coella,* 3 Wash. 99, 28 Pac. 28, we held that the conduct of the trial judge in reading a newspaper while the defendant was on the stand, and engaging in a pleasant conversation with a witness for the state whom the defendant was trying to impeach, constituted a comment upon the weight of the testimony.

"The reading of a newspaper by the judge at the sole particular time while the defendant was upon the stand testifying, and it does not appear that he read it at any other time while the trial was in progress, would lead the jury—always quick to receive an impression from the judge, as well from his acts and manner as from what he may say—to think that the testimony being offered was untruthful or unimportant, and unworthy of their consideration. Also, the witness whose testimony the defendant sought to impeach had testified to some very material matters against him, and it

was of the very highest importance to weaken this testimony if he could do so, and he was entitled to discredit it in all legitimate ways, and to the benefit and effect of all rightful matters going to impair it. The marked conduct of the judge towards this witness, at the time, must have made a decided impression upon the jury. *It was substantially saying to them that the judge believed in this man and indorsed his testimony, and the jury would naturally think that, as the witness enjoyed the confidence of the judge, they should not hesitate to believe him,* notwithstanding the attack made upon him by the defendant. We have a constitutional provision prohibiting judges from commenting on matters of fact to the jury. It was intended to prevent the judge from conveying to the jury his opinion upon the facts, in order that these matters might be left to the exclusive province of the jury." *State v. Coella,* 3 Wash. 99, 28 Pac. 28. (Italics ours.)

The fact that Mr. Foley not only testified as a witness but was the attorney representing the state, made it doubly important that no statement be made by the court calculated, or which might result in influencing the jury. The court, in effect, vouched for the veracity and rectitude of the witness. The conclusion is irresistible that the statement of the learned trial court was clearly a comment upon the weight of the testimony and the credibility of the witness, and hence in violation of the constitution.

The judgment is reversed, and the cause remanded for a new trial.

MITCHELL, HERMAN, and PARKER, JJ., concur.

TOLMAN, C. J. (dissenting)—I am unable to agree with the majority. Giving full force and effect to our constitutional provision and to all of the authorities cited, still I am utterly unable to see in the trial court's remarks anything remotely resembling a comment on the evidence.

The language used, as quoted by the majority, goes solely to the question of admissibility of evidence to be offered. Counsel wanted the witness to ask himself questions so that, if it appeared the purpose was to offer objectionable testimony, an objection might be interposed before the answer was given. The court's remarks plainly meant nothing more than that the witness, being a practicing attorney, knew what was admissible and what was not, and would not attempt to introduce evidence not competent under the issues. The jury, having heard the whole of the colloquy, must have so understood the court's remarks, and if we are to credit the jurors with ordinary intelligence, none could have arrived at any other conclusion.

I therefore dissent.