[No. 38011.    Department One.    June 23, 1966.]

THE STATE OF WASHINGTON, *Respondent,* v. JAMES BROWN, *Appellant.*[*]

*[*]Reported in 416 P.2d 344.

*Dale R. Martin,* for appellant (Appointed counsel for appeal).

*Charles O. Carroll* and *Edwin S. Stone,* for respondent.

HUNTER, J.—The defendant (appellant) James Brown was charged with committing the crime of second-degree assault upon one Samuel Waller resulting from a shot fired from a rifle. The defendant entered a plea of not guilty. He admitted the shooting but asserted it was in self-defense.

At the conclusion of a jury trial, a verdict was returned finding the defendant guilty of the crime of second-degree assault as charged. Judgment was thereupon entered, from which the defendant appeals.

The facts surrounding and preceding the shooting incident are in direct dispute. On May 18, 1964, the day of the shooting, the defendant and the prosecuting witness Waller lived in separate houses on the north side of South Norman Street in Seattle, separated by a house occupied by a Mrs. Elizabeth Martin. South Norman Street is unpaved and without side-

walks in an impoverished area, and the three houses were in close proximity. A few months prior to May 18th, Waller had lived with the defendant for about 2 weeks. Thereafter, he moved to 1618 Norman Street, the second house to the west. Waller testified he was requested to move from defandant's house because the defendant had concluded that Waller was responsible for Mrs. Martin having spurned the defendant's amorous advances, and he believed Mrs. Martin was in love with Waller and was having sexual relations with him.

Mrs. Martin testified that the defendant had professed to be in love with her, but she had refused his advances; that he left notes in her mailbox, attached to her dog's collar, and at the Cosmopolitan Tavern. An examination of the notes disclosed that he had evidenced his love, and one note acknowledged he had been requested by her to stay away from her house. She further testified that the defendant was jealous of Waller and believed she was sleeping with him.

Waller testified that on the evening of May 18th, about 10 p.m., he was returning to the Cosmopolitan Tavern after feeding his dog. As he passed a trailer in front of the defendant's house he heard a "click," and saw the defendant with a long black object, heard the report of a rifle, and fell to the ground as a result of a 7.62 millimeter bullet striking his right leg; that he dragged himself into Mrs. Martin's house. A Mr. Mann, who was in the house, testified he heard the defendant yell "Come out, come out, I am going to kill ya." The police arrived shortly thereafter and Waller was taken by ambulance to the Harborview Hospital. The evidence shows that the bullet entered the inside of Waller's right thigh and emerged on the outside of the thigh.

According to the defendant's version Waller moved into defendant's place of residence in February, 1964, after Waller was released from a sentence he was serving for a felony conviction; that they did not get along, and at the end of about 2 weeks the defendant asked him to move out; that thereafter there was constant bickering over a television set and certain other items of furniture in defendant's

residence which Waller claimed belonged to him. The defendant testified that he had purchased the furniture and television from a former occupant and had paid an extra amount to have the television repaired; that he refused to give it to Waller unless he paid him the purchase price and the amount of the repair bill.

On the afternoon of May 18th, the squabble was renewed. The defendant again refused to surrender the television unless Waller paid the defendant the price he had paid for the television and the amount of the repair bill, or if his landlady or the police told him to turn it over to Waller. Late that evening the dispute was resumed without resolution. Shortly thereafter, the defendant walked by Waller's residence on his way home to feed his dog, and Waller came out and again renewed the argument. The defendant walked on past to his house, and Waller went back into his house. After feeding his dog in the front yard, the defendant saw Waller leave his house and come up toward the defendant's yard. Waller had put on an overcoat, and observing his demeanor, the defendant removed his loaded rifle from its place inside the front door of the house and leaned it against the porch. Waller entered the yard, his right hand thrust into his overcoat pocket, shaking his left hand at the defendant. They argued and Waller told the defendant he had come to get the television. The defendant refused to surrender it. Waller threatened him, saying that he would whip him "like he did Shorty." The defendant testified that he knew Shorty had been pistol whipped; that he (defendant) was still tender from a hernia operation; and that he visualized a pistol in Waller's pocket where his hand remained. The defendant picked up his rifle, neither advancing nor retreating from his position at the foot of the steps of his house. Waller continued toward the defendant, indicating he was not afraid that the defendant would shoot. The defendant warned him "Don't come up on me." Waller continued to advance. The defendant pulled the trigger, aiming it at Waller's feet, but the gun jumped and the bullet struck him in the thigh. Waller fell into the street and then dragged himself over to the Martin house. The defendant testified

that he returned to his house, placed the gun on the bed, and left for the purpose of surrendering to the police, which he did within 2 hours.

The defendant assigns error to the ruling of the trial court limiting his cross-examination of the witness Elizabeth Martin on her immoral course of conduct.

The defendant first contends that he was entitled to pursue such an examination of the witness for the purpose of impeaching her credibility, relying on *State v. Coella,* 3 Wash. 99, 28 Pac. 28 (1891), as affirmed in *State v. Cooper,* 26 Wn.2d 405, 174 P.2d 545 (1946) and *Lankford v. Tombari,* 35 Wn.2d 412, 213 P.2d 627, 19 A.L.R.2d 462 (1950).

In *State v. Wolf,* 40 Wn.2d 648, 245 P.2d 1009 (1952), the philosophy of the *Coella* rule was exhaustively considered, in a review of the cases in which it had been previously applied. We there stated in discussing the *Coella* rule that evidence relative to the immoral conduct of witnesses falls into two classes: "(1) cross-examination or independent evidence tending to show specific acts of misconduct; and (2) evidence tending to show general reputation for chastity." We noted that precedent for the admission of evidence falling into either category, whether considered as a matter of right or as a matter of judicial discretion, goes back to the early case of *State v. Coella, supra.* We said:

Our immediate concern is with regard to the second of the two categories of evidence referred to above. It will therefore not be useful to recount in detail the development of the rule relative to the admissibility of evidence as to specific acts of misconduct. It may be noted, however, that the rule permitting the parties to introduce such evidence as a matter of right, as distinguished from judicial discretion, has been applied only in cases involving seduction (*State v. Jones,* 80 Wash. 588, 142 Pac. 35), statutory rape (*State v. Godwin,* 131 Wash. 591, 230 Pac. 831), and gambling (*State v. Smith,* 145 Wash. 250, 259 Pac. 711). The latter case was overruled, in effect, in *State v. Gaffney,* 151 Wash. 599, 276 Pac. 873, 65 A.L.R. 405, and the rule permitting such evidence as a matter of right was completely abandoned as to all types of cases in *State v. Linton,* 36 Wn. (2d) 67, 216 P. (2d) 761. In that decision, involving a charge of statutory rape, it was held

that the admission of evidence as to specific acts of misconduct, to affect credibility, rested within the sound discretion of the trial court.

. . . .

*State v. Linton* left the door open to receive evidence as to specific acts of immoral conduct if the trial court, in its discretion, found it acceptable.

■ It appears clear that the *Coella* rule, as to showing specific acts of immoral conduct to affect the credibility of a witness, has been restricted from a matter of right for the introduction of such evidence, to that of the exercise of discretion by the trial court in determining its admissibility. The question then posed is whether the trial court abused its discretion in failing to permit the defendant to cross-examine the witness Mrs. Martin on specific acts of misconduct in order to impeach her credibility. We do not find that the trial court abused its discretion insofar as its ruling restricted the cross-examination for purposes of impeachment of credibility.

However, the defendant contends that the purpose of his offer of proof was also to destroy the motive built up by the state on direct examination and in the opening argument.

■ It is evident from the record that the basic theory of the state's case to support the testimony of Waller that he was ambushed by the defendant was to establish a motive of the defendant's jealousy of Waller. The state called Mrs. Martin as its witness for this specific purpose. This witness testified that the defendant had professed his love for her, which she had rejected, and that he had indicated his jealousy by reason of his suspicion of Waller's affection for this witness. The defendant therefore contends that he was entitled to show by his cross-examination of Mrs. Martin that she had slept with the defendant, that she slept with other men, that she had accepted money from them, and that she had never denied the defendant her favors when he asked for them, providing he had the price. Defendant's counsel concluded his offer of proof as follows:

I will prove that there is absolutely no reason for them to fight over this woman because she is available at any time to either one when they happen to have the price.

We believe that under these circumstances the defendant was unduly restricted in his cross-examination, and that the trial court abused its discretion by preventing further questioning to offset the state's theory of motive. Our examination of the record, however, in regard to the effect of the court's ruling denying a further examination of the witness to establish the immoral conduct of the witness, is revealing. Prior to the limitation of the examination, the defendant had asked certain key questions and had received answers thereto which indicated the futility of attempting to prove specific acts of immoral conduct by this witness.

Q. . . . Did you ever have any relations with James Brown? A. No, I did not. . . . Q. . . . You say that James Brown accused you of being in love with the defendant, is that correct? In love with Samuel Waller, is that correct? A. Not in love, interested with. Q. Interested. And you say you were not interested in Samuel Waller? A. As nothing but a neighbor. Q. You never had any relations with Samuel Waller at all? A. I did not.

The record, therefore, shows that the defendant was permitted to examine the witness as to the specific acts of immorality that were particularly pertinent to the issue of motive to commit the assault upon Waller by reason of his jealousy. Any further examination would have been repetitious insofar as the witness' conduct with these men was concerned. Moreover, the record further shows that the defendant was permitted to testify at length as to his asserted sexual relations with Mrs. Martin for several months prior to the shooting incident, when he stated that on occasions he gave her money or furnished her with liquor for a consideration. On the other hand, the record shows from the notes communicated to the witness by the defendant that he had in fact professed his love for her and that she had requested him to stay away from her home. We do not believe, in view of this record, that the defendant was prejudiced and denied a fair trial by the limitation of further cross-examination of Mrs. Martin by the defendant.

■ The defendant further assigns error to the failure of the trial court to give his proposed instruction on the right of the defendant to stand his ground in the defense of his person and property. He relies on *State v. Cushing*, 14 Wash. 527, 45 Pac. 145 (1896). Our examination of that case discloses that the instruction on self-defense otherwise given was inadequate and incomplete; that it was therefore error in that case to refuse the requested instruction. Not so in the instant case. The record shows that by instructions Nos. 10, 11, 11½ and 12, given by the trial court, the jury was fully instructed as to the law on the issue of self-defense, although the right of the defendant to stand his ground and not retreat was not mentioned in the instructions. The instructions, nevertheless, were sufficiently broad for defendant's counsel to argue his theory of self-defense to the jury.

The defendant finally assigns error to the failure of the trial court to comply with the pretrial order of the presiding judge, granting the defendant's motion for the production of the documents, which provides in part as follows:

ORDERED that the Prosecuting Attorney produce for inspection and reproduction by the defense any and all statements of Samuel Waller, Robert Mann, Elizabeth Martin, Officer D. Dorris, Officer J. Fisher, Detective V. Thomas, Detective R. V. Jackson, Detective G. D. Yates and Detective D. J. Driscoll who are indorsed on the information as witnesses for the State; any and all statements made by witnesses the State intends to call whose names are not so indorsed upon the information; and any and all statements made by witnesses even though the State does not intend to call them as witnesses in the trial of this action; and it is further

ORDERED that the Prosecuting Attorney produce for inspection and reproduction by the defense any and all statements made by the defendant James Brown; and it is further

ORDERED that the Prosecuting Attorney procure and make available for inspection and reproduction by the defense a record of the prosecutions and convictions, that is, the criminal record or "rap sheet" of the prosecuting witness, Samuel Waller.

This order was modified as follows:

The undersigned Judge of the above-entitled Court herein and herewith modifies the Order Compelling Production of Documents heretofore entered in this cause on the 28th day of September 1964, by amending the same to reflect the following changes:

1. To qualify that portion of the order requiring production of statements of witnesses, by expressly excluding therefrom anything which might be construed as a requirement that the Prosecuting Attorney produce statements which represent the "work product" of the Deputy Prosecuting Attorney who is assigned to the trial of this cause.

2. To revoke that exercise of discretion by which it was ordered that the Prosecuting Attorney be required to procure and produce for inspection and reproduction the criminal record or "rap sheet" of the prosecuting witness, Samuel Waller.

This modification is entered without prejudice, expressly reserving to defendant the right to renew his request before the Judge to whom this cause is ultimately assigned for trial.

▇ The record shows the defendant was furnished with all statements of witnesses except the investigation reports of the officers, which the trial court refused to require for the reason that, in its opinion, they reflected the work product of the deputy prosecuting attorney as interoffice communications which may have reflected conclusions of the officers and other immaterial matters. The possibility that these reports may have contained opinions of the officers would not necessarily qualify them as the work product of the deputy prosecutor. Speculation by the trial court that the reports *may* have included matters reflecting the work product of the deputy prosecuting attorney was not sufficient to support the trial court's ruling. However, the trial court stated it would give defense counsel an opportunity to interview any of the officers outside the presence of the jury in the event they were called as witnesses. Four of the six officers did testify. There is no showing in the record that the defendant attempted at any time to interview any of these officers. We cannot assume that the

officers would have failed to relate to the defendant's counsel the complete result of their investigation of the case at such an interview. Under these circumstances, we find no showing of prejudice to the defendant by the trial court not requiring the state to furnish to the defendant the requested reports.

The crucial part of the denial, however, was the so-called "rap sheet" of the prosecuting witness Waller, which was purported to be in the possession of the state, having been furnished by the FBI. The information contained therein, as to previous convictions, was vital to the defendant for the reason that it was his basic contention that he was in apprehension and in fear of receiving grievous bodily harm from Waller by reason of his knowledge of Waller's previous convictions, particularly his conviction of assault for the "pistol whipping" of one George "Shorty" Macker.

The record discloses that the trial judge was aware of the importance to the defendant that he obtain admissions of Waller's prior convictions, with which the defendant was familiar, to corroborate his testimony as to his apprehension and fear of receiving grievous bodily harm from this witness. The record discloses that the trial court expressly directed the deputy prosecutor, in several instances, to obtain the "rap sheet" on Waller from his files and deliver it to the defendant, whereupon the deputy prosecutor was repeatedly reluctant and evasive, stating that he felt the information furnished by the FBI was privileged, but agreeing, however, to disclose to the defendant all of the convictions of Waller about which he had any knowledge. This was done. The court, moreover, personally examined Waller on these purported prior convictions, obtaining admissions to all the prior convictions within the prosecutor's knowledge, consisting of second-degree burglary, conducting a lottery, petty larceny, and third-degree assault. We do not believe, under these circumstances, that the defendant was prejudiced by the denial of the information contained on the "rap sheet."

We are satisfied that the defendant was fairly tried. The judgment of guilty entered upon the verdict is affirmed.

ROSELLINI, C. J., OTT, J., and WARD, J. Pro Tem., concur.

HILL, J., concurs in the result.