[No. 11885. Department One. January 11, 1915.]

## THE STATE OF WASHINGTON, *Respondent*, v. J. W. JACKSON et al., *Appellants.*[1]

CRIMINAL LAW—TRIAL—MISCONDUCT OF PROSECUTION—INCRIMINATING EVIDENCE—DEMAND FOR PRODUCTION. Under the Federal and state constitutions providing that no person in any criminal case shall be compelled to be a witness against himself, a demand upon defendant, in the presence of court and jury, to produce documents which will tend to criminate him, invades the defendant's constitutional grant of immunity, and hence constitutes reversible error.

WITNESSES—PRIVILEGE—RIGHTS OF ACCUSED—CONFLICT OF CONSTITUTIONAL AND STATUTORY PROVISIONS. Although the rules of practice in civil cases, in the absence of a special statute, are made the rule of practice in criminal cases, such statutory rules cannot be given effect where their operation would contravene the constitutional guaranty for the protection of a defendant, on trial in a criminal case, that he shall not be compelled to be a witness against himself.

SAME—SELF-INCRIMINATION—WAIVER. Where the state has placed the accused under the imputation of guilt by demanding on the trial that he produce certain documents, the defendant does not waive objection to the violation of his constitutional guaranty against being compelled to be a witness against himself by subsequently taking the stand in his own behalf and testifying as to the matters inquired into; since placing him under the imputation of guilt forces him to take the stand and he is not a voluntary witness.

CRIMINAL LAW—TRIAL—MISCONDUCT OF JUDGE—COMMENT ON EVIDENCE. It is misconduct constituting a comment on the evidence, within the prohibition of Const., art. 4, § 16, for a judge, in a criminal action, to so examine a witness essential to the defense as to suggest a doubt as to the integrity of the witness.

SAME—APPEAL—EXCEPTIONS—COMMENT ON EVIDENCE. The action of the court in commenting on the facts in a criminal case, by so questioning a witness as to convey to a jury doubt as to her integrity, being an invasion of the constitutional rights of the accused prohibiting the judge from commenting on the facts, may be reviewed on appeal although no exceptions were interposed at the time; such conduct constituting neither a "ruling" or "decision," within Rem. & Bal. Code, § 381, requiring exceptions.

[1]Reported in 145 Pac. 470.

WITNESSES—IMPEACHMENT—REPUTATION OF WITNESS—IMMORALITY. For the purpose of impeaching a female witness for the state, it is error to refuse to allow the defendant to prove her general reputation for morality in the neighborhood in which she lives.

Appeal from a judgment of the superior court for Pacific county, Wright, J., entered November 11, 1913, upon a trial and conviction of conspiracy to obstruct justice. Reversed.

*John T. Welsh, M. M. Richardson,* and *Robert G. Chambers,* for appellants.

*H. W. B. Hewen,* for respondent.

CHADWICK, J.—Appellants were convicted of the crime of conspiracy to pervert and corrupt public justice and the due administration of law, in the superior court of Pacific county, Washington, in a case there pending entitled J. W. Coleman and Belle Coleman v. The City of Raymond. They have brought their case here, making twenty-one assignments of error. We will not discuss assignments which in our judgment have no merit, or which will not likely recur upon a new trial, or those which we regard as without prejudice.

It is one of the contentions of the state that the defendants, acting in conspiracy, had paid money to suborn the testimony of certain witnesses. The city of Raymond had drawn a warrant which had been forwarded to one of the defendants at Portland, Oregon, where it is alleged the witnesses were corrupted. The state also contended that a witness had been induced to make a certain statement in writing and that the statement tended to prove the crime charged. Prior to the trial, the prosecuting attorney made a demand upon the defendants to produce the draft and statement. They were not produced. A witness was called to give secondary evidence as to the contents of the bank draft, and the witness, who it is alleged signed the statement, was called for a like purpose. The prosecuting attorney, in the presence of the court and jury and over the objections of counsel,

renewed his demand for the production of the documents. This in our judgment constitutes reversible error.

"To permit a demand to be made on the defendant in a criminal case, in the presence of the jury, to produce a paper or document containing incriminating evidence against him, is a violation of the immunity secured to him by the fifth amendment to the Constitution of the United States, providing that no person in any criminal case shall be compelled to be a witness against himself." *McKnight v. United States*, 115 Fed. 972.

The reasoning to sustain this principle lies in this: That the state is not put to the necessity, neither will it be permitted to put an inference of guilt which necessarily flows from an imputation that the accused person has suppressed or is withholding evidence, when the constitution provides that no person shall be compelled to give evidence against himself. Not being bound to produce evidence against himself, the demand is futile and can serve no purpose, except to put defendant in a false light before the jury and compel him to defend himself against the inferences arising from a collateral circumstance and to the stress of extricating himself from a position in which the constitution says he shall not be placed. The state, under the ordinary rules of evidence, could have examined either one of the witnesses as fully and as completely as it desired without demanding the documents.

In *Gillespie v. State*, 5 Okl. Cr. 546, 115 Pac. 620, it is said:

"When such a demand is made, a defendant must accept the alternative of either producing the letters, and thereby incriminate himself, or of having the jury place the strongest possible construction against him upon his failure to do so. If this can be done, the very life, body, and soul of the constitution would be violated and trampled upon."

See, also, *McKnight v. United States*, 122 Fed. 926; *State v. Merkley*, 74 Iowa 695, 39 N. W. 111; *Ellis v. State*, 8 Okl.

Cr. 522, 128 Pac. 1095; *Hibbard v. United States*, 172 Fed. 66.

While the question has never come to this court in just the same way, the principle is recognized in the case of *State v. O'Hara*, 17 Wash. 525, 50 Pac. 477, 933, where a reversal was predicated upon a record showing that the court had compelled a defendant, who was a witness on his own behalf and over his objection, to testify that certain letters and documents had been written by him, and in *State v. McCauley*, 17 Wash. 88, 49 Pac. 221, 51 Pac. 382, where it was held that the right of the state to introduce secondary evidence did not depend upon a notice to produce documents possessed by a defendant and which were believed to be incriminating, for the reason that it was beyond the power of the court to enforce the demand. The court followed *McGinnis v. State*, 24 Ind. 500:

"It is difficult to perceive what benefit could result, either to the state or the defendant, from giving of such a notice, while to the defendant it is liable to work a positive injury, by producing an unfavorable impression against him in the minds of the jury, upon his refusal to procure it after notice."

But it is contended by the prosecuting attorney that the rules of practice in civil cases, in the absence of a special statute (Rem. & Bal. Code, §§ 2137, 2152, 2158 [P. C. 135 §§ 1165, 1153, 1185]), are made the rule of practice in criminal cases. Admitting that, in a proper case, this contention would be well founded, it is sufficient answer to say that no statutory rule of practice, whether in a civil or criminal case, would interfere to bar a defendant of the protection of § 9, art. 1, of our Bill of Rights and of the fifth amendment to the constitution of the United States.

The prosecuting attorney earnestly and sincerely challenges the rule in the case of *McKnight*. He cites many cases holding that it is not error for the prosecuting attorney to comment upon the fact that a defendant has failed to produce evidence that was within his possession and under his

control. Our answer to these cases and his argument is that this court, in the cases of *O'Hara* and *McCauley* has adopted a different rule, and that they are, in our judgment, hostile to the fourth amendment of the constitution of the United States, and possibly to the constitutions of the states where they were pronounced. The prosecuting attorney also relies upon the criticism of Mr. Wigmore, who, in his work on Evidence, vol. 3 (1904 ed.), p. 3149, § 2273, note 3, says:

"*McKnight v. United States*, 115 Fed. 972 [is unique] after evidence that an incriminating document is in the accused's possession, no notice of production can be given by the prosecution, because the claiming of the privilege would permit inferences to be drawn against him; the ruling is made on the assumption that a copy could be used under such circumstances without notice to produce,—an incorrect assumption, as shown *ante* §§ 1202, 1205, 1207; it also involves the fallacy that the mere necessity of making a claim of privilege for documents is improper because of the possible resulting inference,—a fallacy which reasons in a circle, because the privilege cannot be enforced until it is claimed and the court cannot both enforce it and forbid the necessary condition precedent to enforcing it; the ruling also involves the fallacy that the accused's failure, on notice, to produce the document was equivalent to a claim of privilege, but it was not, because it might have been done in precisely the same way if a non-criminating document and would merely have served as a basis for the use of a copy by the prosecution; these three fallacies so subtly combined in this ruling that the result is a plausible one; but the ruling remains purely fallacious and wholly unsound."

If we were treating the question in the abstract, it might, with some plausibility, be contended that we were reasoning in a circle, but reasoning cannot be rejected as meeting itself at the other side of a circle, when at the point of meeting it comes counter to a constitutional provision which says that a thing shall not be done. This means, shall not be done directly or by the pursuit of indirect methods. Furthermore, the reasoning of the learned text writer is faulty in this:

the constitutional privilege of the defendant is known to the prosecuting attorney, and to demand a paper alleged to be incriminating, a jury being present, can bear but one construction, and that is a purpose to cast a reflection of guilt.

We reject the authorities cited by the state for the further reason that, under our statute and under the fundamental principles of the law as we understand them to be, the state could have proved all that it hoped to prove without a demand either before or at the trial. The state contends, also, that, granting all this to be so, it was error without prejudice because the defendants took the stand in their own behalf and testified as to the matters inquired into. The principle that one who voluntarily offers himself as a witness cannot invoke that provision of the constitution which guarantees that no person shall be compelled in any case to give evidence against himself, is relied on. *State v. Duncan*, 7 Wash. 336, 35 Pac. 117, 38 Am. St. 888; *State v. Ulsemer*, 24 Wash. 657, 64 Pac. 800.

These cases do not apply to the case at bar. It cannot be said that a witness who has been put under the imputation of guilt (Chamberlayne, Modern Law of Evidence, 1080) in defiance of the constitution of the state and who offers himself as a witness to explain so far as he can the testimony which in law he has been forced to give against himself by inferential and indirect methods, is a voluntary witness. The fact that a witness may be compelled to answer to the jury for something that could not be introduced directly, is in itself enough to sustain the protective clauses of the constitution. If it were not so, the state, having no right to call for the testimony, could, by putting the imputation of guilt which follows an insinuated suppression of evidence upon a defendant, force an issue where there was none and where none could have been raised directly. We are satisfied that the substantial and constitutional rights of the defendants were violated by the proceedings complained of.

Mrs. Marguerite Jackson was called as a witness. Mrs. Jackson is not related to the appellant Jackson. She is a professional stenographer and was apparently a disinterested witness. She had been employed at Portland, Oregon, by the defendant Welsh to prepare certain interrogatories to be put to the principal witness, Maggie Rose. She testified, as did two other witnesses, that she wrote out the interrogatories and the answers thereto, on April 15, and that they were sworn to by Mrs. Rose on that day. Mrs. Rose at the trial testified that she had not signed interrogatories and answers in the office of the attorney where they are said to have been written, prior to the 25th day of April, 1913, when she gave a deposition in the case, which was favorable to the defendants. Her testimony is to the effect that the appellants, prior to the 25th of April, met her at a hotel in the city of Portland; that they had questions and answers written out; that she was schooled as to the testimony she was to give, and that a copy of the questions and answers were given her so that she might perfect herself as a witness in behalf of the city in the case of Coleman v. Raymond.

We think it will hardly be contended that a conviction could have been had in this case without the testimony of Mrs. Rose. She swore that she had been paid money by defendant Jackson. During the progress of the examination of Mrs. Jackson, and while she was under cross-examination by the prosecuting attorney, and while the paper which Mrs. Rose says had been handed to her by Welsh for the purpose of rehearsing her testimony was a subject of inquiry, the court of its own motion interrupted and cross-examined the witness as follows:

"The Court: *Where did this paper come from, part of the stock in the office of McCue?* A. Yes, I used some of their stationery. The Court: *You say you have your note book here. Will you let me see it?* A. Yes, sir. The Court: *Turn to the notes of this particular proceeding. You just took a book over there?* A. Yes, sir. The Court: *No date on it?* A. No. (The Court examines note book.) The Court: *How*

*many pages does that cover?*  A.  I think it covers three pages of typewriting.  The Court: *Your notes I mean?*  A. *Nine pages.*  The Court: *You have no dates in this book at all?*  A.  No, I haven't.  The Court: *What system of short-hand do you use?*  A. Howard Pitman.  Q. *Would you like to leave on the afternoon train—do you need this book particularly?*  A. Yes, I have notes in there.  I don't know there is anything on the back of those notes that I wish to save.  The Court: *You retain it so we can get it?* . . . Mr. Hewen:  When you commenced to use the book did you commence at this front portion?  A.  I did.  Q.  Why was it then that on the very first sheet of this book the case of J. W. Coleman and Belle Coleman against the City of Raymond is titled?  A.  I took the interrogatories that were dictated to me by Mr. Welsh to be propounded to the witness on the 26th.  Q.  That was on the 15th?  A.  Yes, that was on the 15th.  Q.  But here these interrogatories about which you have testified that were propounded to her on the 15th occur nine or ten pages, or a number of pages, further over in the book; why is that? . . . Those interrogatories were dictated so they could be propounded on the 26th.  The Court:  The first page shows the title of the case and then that is followed by what—the interrogatories to be given on the 26th?  A.  Yes, sir.  Q.  And that is followed by what?  A.  By her statement she made.  Q.  And that dictation was taken as I understand you during the half hour preceding the arrival of Mrs. Rose?  The Court: *That seems to be in consecutive order.*  Mr. Hewen:  Q.  Will you turn to the first page of your book and read the interrogatories there contained of which you have just testified?  Mr. Welsh:  Which interrogatories?  Mr. Hewen:  The first ones.

"The Court:  The ones to be used on the 26th.  (The witness here reads questions and answers from her note book.)  Witness reading.  A.  What is your name and where do you reside?  Q. Next?  Q.  Where were you residing on or about the first day of October, 1912?  Q.  Yes?  A.  Are you acquainted with J. W. Coleman, the plaintiff in the above entitled action, and if so for how long have you known him?  Q.  Yes?  Q.  Did you see said J. W. Coleman on the night of the first of October, 1912, or the morning of the second of October, 1912, and if so state when and where and what was

he doing and did you have any conversation with him at that time and if so what was it?

"(Examination resumed.)

"Mr. Hewen: Q. Let me ask you a further question. If those were the interrogatories to be propounded on the 26th that were dictated to you by Martin Welsh, did Mr. Welsh at that time make any explanation when Mrs. Rose a few minutes afterwards came in and those other questions were propounded, why he didn't propound those questions to her? A. No, he wouldn't make any explanation like that to me. Q. He made no explanation? A. No. Q. But went forward and propounded an entirely different set of interrogatories? A. He never used any paper at all in asking his questions. Q. He didn't ask you to read these off? A. He didn't. I was not a notary."

We have italicized that part of the examination, or rather cross-examination, by the court which in our judgment is objectionable and sufficient, when taken in connection with other facts and circumstances in the case, especially the great importance, if not the absolute essentiality of the testimony of the witness Maggie Rose, to sustain the contention that the conduct of the trial judge was prejudicial to the rights of appellants. No inference can be drawn from the record other than that the court entertained some doubt as to the credibility of the testimony given by the witness. We think the conduct of the court was clearly a comment upon the evidence and violative of the rights of the appellants under art. 4, § 16, of the constitution. His comment that there was no date on the book, and his inquiry as to where the paper upon which the interrogatories and answers were written had been obtained indicated a doubt as to the integrity of the witness. It at least insinuated the possibility that her statement might be inquired into upon an independent investigation. His remark that the notes seemed to be in consecutive order, stands out as the marking of a circumstance to be considered as against the insinuated doubt. His inquiry as to the system of shorthand used by her likewise indicated a be-

lief on the part of the court that her testimony might bear further investigation, and that he intended to refer the notes to some one who was familiar with the Howard Pitman system of shorthand. This conclusion seems inevitable when the court had the witness read some of the interrogatories from her book so that he might compare them with the written interrogatories and answers, and the final request of the court that the witness leave her note book, and a final charge to her that she retain it so that "we can get it."

The prosecuting attorney does not seriously combat this contention of the appellants, but it is insisted that no exceptions were taken to the conduct of the court. An exception "is a claim of error in a ruling or decision of the court, judge or tribunal, or officer exercising judicial functions, made in the course of an action or proceeding or after judgment therein." Rem. & Bal. Code, § 381 (P. C. 81 § 669). The conduct of the court cannot be called either a ruling or a decision, but it is nevertheless a part of the record upon which a claim of error may be predicated and sustained if actually or impliedly prejudicial. Indeed, such an act would ordinarily put a person accused of crime and who is attended by a presumption of innocence to great embarrassment, and make it more likely that prejudice would result if counsel engaged the court even to the extent of excepting to his remarks. Every lawyer who has ever tried a case, and every judge who has ever presided at a trial, knows that jurors are inclined to regard the lawyers engaged in the trial as partisans, and are quick to attend an interruption by the judge, to which they may attach an importance and a meaning in no way intended. It is the working of human nature of which all men who have had any experience in the trial of cases may take notice. Between the contrary winds of advocacy, a juror would not be a man if he did not, in some of the distractions of mind which attend a hard fought and doubtful case, grasp the words and manner of the judge as a guide to lead him out of his perplexity. On the other

hand, a presiding judge has no way to measure the effect of his interruption. The very fact that he takes a witness away from the attorney for examination may, in the tense atmosphere of the trial, lead to great prejudice.

"It is a task of great delicacy and much difficulty for a presiding judge to so conduct the examination of a witness that nothing, in either the tone or inflection of the voice, the play of the features, the manner of propounding or framing the question, or the course of investigation pursued in the examination will indicate to the jury the trend of mind of the questioner. An extended examination of a witness by the court must be unfair unless it partakes partly of the nature of a cross-examination, and though great skill and tact and perfect fairness be employed, there is much danger the impression or opinion of the court as to the truthfulness, candor and reliability of the witness and as to the weight and value of his testimony will be manifested to the jury. Though at times the court may, by an opportune and carefully considered question, elucidate a point, aid an embarrassed witness, or facilitate the progress of a trial without in any degree influencing the jury or arousing distrust in the minds of the parties or their attorneys, yet the examination of witnesses is the more appropriate function of counsel, and it is believed the instances are rare and the conditions exceptional in a high degree which will justify the presiding judge in entering upon and conducting an extended examination of a witness, and that the exercise of a sound discretion will seldom deem such action necessary or advisable." *Dunn v. People*, 172 Ill. 582, 50 N. E. 137.

"In a criminal case the action of the trial judge in subjecting the witnesses of defendant to a rigid and extended examination on the vital points of the defense, or in catechising them at length as to their knowledge of the facts as to which they have testified, has a tendency to discredit them and is prejudicial error requiring a new trial in case of conviction." 40 Cyc. 2440.

While counsel cites many cases to the effect that an exception must be taken before alleged misconduct of the court can be taken notice of on appeal, the authority is not apt or pertinent. As said in the case of *State v. Crotts*, 22 Wash. 245,

60 Pac. 403, our constitution, in so far as it declares that a judge should not comment upon the facts, is unlike the constitution of other states.

"There is no other constitution that we have been able to find that is as prohibitive of the action of the court in this respect as ours."

The principle relied on has been decided by this court in the case just cited. It was urged that misconduct of the court in questioning the witness could not be taken advantage of in this court because no exceptions had been taken. Judge Dunbar, whose keen sense of fairness and justice was never doubted by any man, wrote the opinion, saying:

"It is urged by the respondent that, as no exceptions were taken by the defendant to the questions propounded by the judge at the time they were propounded, under the general rule, and under the rulings of this court, no basis for a determination of those questions in this court has been laid. It is true that the ordinary rule is in consonance with the ruling, frequently announced by this court, that alleged errors will not be reviewed without they are excepted to at the time they are committed; but we do not think the error alleged in this instance falls within the rule, nor that the rule should be enforced when its observance would tend to destroy the very object for which the objection is ordinarily made. An attorney is placed in a delicate position under such circumstances. It is dangerous for him to enter into a controversy with the court in relation to matters and proceedings which the court itself is instituting. The court should not place counsel in this position without it becomes absolutely necessary for the furtherance of justice. In this case the defendant's counsel had to choose between the probability, or at least the possibility, of prejudicing his case in the minds of the jury by reason of his expressed opposition to the course pursued by the court, or else lose the benefit of an objection which he was entitled to make. We do not think counsel should be compelled to imperil their cause in the lower court for the purpose of protecting their rights in the appellate court. . . .

"There are different ways by which a judge may comment upon the testimony, within the meaning of the constitution re-

ferred to above. The object of the constitutional provision, doubtless, is to prevent the jury from being influenced by knowledge conveyed to it by the court of what the court's opinion is on the testimony submitted. The constitution has made the jury the sole judge of the weight of the testimony and of the credibility of the witnesses, and it is a fact well and universally known by courts and practitioners that the ordinary juror is always anxious to obtain the opinion of the court on matters which are submitted to his discretion, and that such opinion, if known to the juror, has a great influence upon the final determination of the issues."

See, also, *Knox v. Fuller*, 23 Wash. 34, 62 Pac. 131.

Appellants undertook to prove the general reputation of the witness Maggie Rose, for morality in the neighborhood in which she lived. The court sustained an objection to this form of proof. Maggie Rose, as we have said, was the principal witness for the state, and without her testimony it is not likely that a conviction could have been had. The testimony was competent under the authority of *State v. Coella*, 3 Wash. 99, 28 Pac. 28. The rule as stated by Underhill in his work on Criminal Evidence (2d ed.), § 237, is as follows:

"Impeachment by showing the general bad character of the witness aside from truthfulness. A few authorities reject all evidence to prove the good or bad character of a witness, except so far as it is confined to his reputation for truthfulness, or the reverse. If the witness possessed no knowledge of that particular trait of character, he is incompetent. *But the majority of cases allow greater latitude. In most cases, evidence involving the whole moral character of the witness will be received upon the reasonable theory that a man who is addicted to vicious habits,* or who is prone to commit immoral acts, may be presumed to have lost respect for truth and to be ready to perjure himself when it is to his interest to do so."

The prosecuting attorney seeks to distinguish the *Coella* case. He says that the witness was there asked upon cross-examination "if she were not a prostitute," and there is a greater latitude allowed in cross-examination than when offering independent proof. We nevertheless believe that the

reputation of a witness for immorality may be inquired into, either upon cross-examination or by a resort to general reputation. It is not the manner of proof that concerns the law so much as the object sought to be attained, for, as said by this court in the *Coella* case, a woman cannot ruthlessly destroy that quality upon which most other good qualities are dependent and for which, above all others, a woman is reverenced and respected, and retain her reputation for truthfulness unsmirched. We can mark no distinction between receiving evidence as to the reputation of a witness for truth and veracity and receiving evidence of reputation as to moral character, when this court has said that a reputation for immorality is a thing to be considered when passing upon the credibility of a witness.

The state contends that the case of *State v. Poyner*, 57 Wash. 489, 107 Pac. 181, is not in point. In that case the question "Do you know the reputation for chastity in Cle Elum of Minnie Black?" was asked of a witness. Counsel say that the question was proper because of the nature of the crime charged, which was that the defendant associated and cohabited with a woman not his wife. On the contrary, it is evident that the purpose of the testimony was to create a reasonable ground for an inference that the woman, who was a witness upon the trial, was not a person of dependable veracity. If it were not so, then the question would have been irrelevant and immaterial to the issue, for the statute then in force made one so cohabiting guilty without reference to the character of the woman with whom he cohabited.

It is strenuously contended that, upon the whole case, there is not enough testimony to sustain a conviction. The case comes to us with a statement of facts and record comprising some two thousand pages. We cannot review the facts within reasonable compass. It is enough to say that, after an examination of the record, we are of the opinion that however weak the testimony may be as viewed by an appellate court, there is some evidence which would carry the case to a jury.

There are a number of assignments calling attention to incidents attending the trial but not going to the substantive facts or law of the case which, although not regarded by us as sufficiently prejudicial to warrant a reversal, should not occur on a retrial.

Reversed and remanded for a new trial.

CROW, C. J., MORRIS, GOSE, and PARKER, JJ., concur.