# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59684-9-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| TYRELL ORIN RUTLEDGE, | |
| Respondent. | |

Che, J. — The State appeals the trial court's decision under CrR 8.3(b) to set aside the jury's conviction for third degree assault and dismiss the prosecution for government misconduct after finding that the State's only witness gave "false testimony" and the State failed to correct the testimony.

At trial, the State's only witness, a state park ranger, testified that he was interested in stopping Tyrell Rutledge for both a traffic infraction of failing to stop at a stop sign and for a violation of a state park's closing hours rules. After the State rested at trial, the trial court, on its own accord, excused the jury, raised a suspicion that the ranger was lying about the reason for stopping Rutledge, called the ranger to the stand, and interrogated the ranger. Despite denying Rutledge's midtrial motion to dismiss based on a pretext argument and sending the case to the

jury which ultimately found Rutledge guilty, the trial court opined repeatedly that it believed the ranger had no credibility, was lying, and was misleading the jury.

After accepting the jury's verdict, the trial court set a hearing date before sentencing, "assuming there's going to be a [post-trial] motion." Rep. of Proc. (Feb. 13, 2024) (RP) at 216. Rutledge brought a post-trial motion for an arrest of judgment under CrR 7.4(a)(3), dismissal or a new trial under CrR 7.5(a)(7), or, alternatively, dismissal under CrR 8.3(b) for government misconduct. The trial court granted the motion under CrR 8.3(b), set aside Rutledge's conviction, and dismissed the case with prejudice. The court found, among other things, that the witness "lied" and the State failed to correct the lie in front of the jury. Clerk's Papers (CP) at 332.

The State argues that the trial court abused its discretion in the proceedings by, among other things, acting as an "advocate" for Rutledge and displaying an appearance of partiality. Br. of Appellant at 17. We agree and, accordingly, reverse the trial court's order dismissing the prosecution under CrR 8.3(b), reinstate the jury's verdict, and remand for sentencing.

FACTS

I. BACKGROUND

In August 2023, a vehicle driven by Rutledge exited a state park and caught the attention of Washington State Park Ranger Nick Schwalb. The time was after 10:00 p.m., which meant it was a violation under the Washington Administrative Code to enter or be in the park unless one was a registered camper. Schwalb had been in the park's campground for the last hour and a half dealing with an individual causing a problem in the park and had not noticed Rutledge's vehicle in the campground or enter the park. The other matter involved Rutledge's ex-wife, and

Rutledge had been in the park so his daughter could see her. However, according to Schwalb, he did not make any connection between the prior incident with Rutledge's ex-wife and Rutledge's vehicle until after he decided to stop Rutledge's vehicle.

Schwalb observed Rutledge approach a stop sign located prior to exiting the park and across from Schwalb's stopped patrol vehicle. Instead of stopping at the stop line, Rutledge stopped past the line but before entering the intersection. Rutledge then flashed his vehicle's lights at Schwalb before turning left, accelerating away from the intersection, and exiting the park. Schwalb pulled out of the park behind Rutledge and followed him to a gas station about a half mile away from the park. Schwalb activated his patrol vehicle's lights, parked behind Rutledge's vehicle, walked up to Rutledge, and identified himself.

During the stop, Schwalb walked back to his patrol vehicle. Rutledge exited his vehicle and began to walk toward the gas station store. Schwalb approached Rutledge, told Rutledge to return to his vehicle, and then attempted to place Rutledge in an "escort" position when Rutledge did not comply. RP at 84. When Schwalb grabbed Rutledge's arm, Rutledge hit the bridge of Schwalb's nose "with a haymaker," and grabbed his arm. RP at 86-87. Schwalb stepped away from Rutledge and drew his taser. Rutledge ran away.

Schwalb did not cite Rutledge for any infraction. However, the State charged Rutledge with third degree assault based on allegations that Rutledge, with the intent to prevent or resist the execution of any lawful process or mandate of any court officer, or the lawful apprehension or detention of himself, assaulted Schwalb.

3

## II. TRIAL

At the jury trial, the State called Schwalb as its sole witness. Schwalb testified consistently with the facts above and that he was a commissioned law enforcement officer able to enforce state laws, including traffic laws. Relevant to this appeal, during the State's direct examination, Schwalb testified that he pulled behind Rutledge after observing him in the park because "I decided to enforce a traffic stop, because of the stop sign. Also, I was going to stop that vehicle for being in [the park] after hours, something that we had been directed to do." RP at 75. Schwalb was interested in determining the identity of who was in the vehicle because it was coming from the park and Schwalb believed it was not registered to a camper.

What happened during the stop was disputed at trial. According to Schwalb, he asked Rutledge for his name and date of birth, told Rutledge he was not free to leave because he had observed "the actual infraction in the state park" and was stopping him for a traffic stop, and advised Rutledge if he did not identify himself, Rutledge would face "additional charges." RP at 80, 98. Rutledge asserted that Schwalb did not have the authority to stop him and asked Schwalb to get a supervisor. According to Rutledge, Schwalb never made any of the aforementioned statements and, upon Rutledge's request for a supervisor, Schwalb walked back to his patrol vehicle without giving Rutledge any directions. Schwalb asserted that he told Rutledge to remain in his vehicle.

Rutledge's daughter, who sat in the vehicle's passenger seat, recorded at least part of Schwalb and Rutledge's verbal exchange. In the recording, Schwalb did not make any of the statements mentioned above. Rutledge's daughter contended that she began recording "within

five seconds of the interaction." RP at 138. However, Schwalb testified the recording began one to two minutes after he approached Rutledge's vehicle.

After the State rested, the trial court excused the jury. The trial court stated it was confused by the State resting after just presenting Schwalb's testimony. The State explained that it did not believe it needed other witnesses given Schwalb's testimony and the admission of a gas station video recording.

Rutledge then moved to dismiss, arguing that the State failed to show that Rutledge was lawfully arrested or detained when Rutledge got out of his vehicle. The trial court responded:

> You know what, I'm not getting the whole story here and the jury is not getting the whole story here. You know how I know that? Because I have experience. And I don't in any way believe that the true motive of the officer here was just a simple, oh, he didn't make a complete correct stop at the stop sign and I'm pulling him over as he's leaving the park, which makes no sense if it's to be believed that he didn't know anything about the vehicle, who was driving. There was no other basis and why do you care? Leaving the park, you don't stop at the—it didn't endanger anybody. It's not reckless driving, negligent driving. It's nothing. It's an infraction, maybe at best. Failure to stop at a stop sign. Something tells me that that was not the reason why this officer followed him to the gas station and ended up in a physical altercation with him. All over what? A stop sign? No, don't think so. So something tells me that with all these other witnesses and all this other business that [defense counsel] asked about, about what happened leading up to that and the other people that Mr. Rutledge was with in the park, I think something else is going on. I firmly believe it down to my bones. And I sure wish I had the truth. I wish the jury had the truth and I wish I had the truth about what really went down that night.

RP at 115-16. The trial court continued:

> But here's my question. My question is, we're talking about an infraction, right. We all agree? That the initial basis for this officer taking the action that he did and chasing after Mr. Rutledge and pulling him over in the gas station parking lot, that was based on a rolling stop? Actually, I think he said he actually completed—made a complete stop.

RP at 116-17.

Rutledge explained he had considered bringing a pretrial CrR 3.6 motion[1] for a pretextual stop[2] but "was not able to fully develop [a pretext argument] until [Rutledge] had the official testimony from—from the Ranger." RP at 118. Upon the State asserting that it had no additional information that there was another reason for the stop, the trial court addressed Schwalb:

> THE COURT: Officer, I'm just going to ask you this one time.
>
> [SCHWALB]: Okay.
>
> THE COURT: I have . . . one question and I want a straight answer.
>
> [SCHWALB]: Yeah.
>
> THE COURT: Was there absolutely any other basis in your mind, objectively or subjectively, other than the stop sign as a reason why you went after Mr. Rutledge?
>
> [SCHWALB]: There—there was, yes.
>
> THE COURT: That's exactly what I thought. That is exactly what I thought and that was not the answer that we got. That was not the explanation we got that,

---

[1] Under CrR 3.6, a party may move to suppress physical, oral, or identification evidence through a written motion. CrR 3.6(a).

[2] A pretextual traffic stop occurs when a police officer relies on some legal authorization "as 'a mere pretext to dispense with [a] warrant when the true reason for the seizure is not exempt from the warrant requirement.'" *State v. Arreola*, 176 Wn.2d 284, 294, 290 P.3d 983 (2012) (alteration in original) (quoting *State v. Ladson*, 138 Wn.2d 343, 358, 979 P.2d 833 (1999)). Pretextual traffic stops, are unconstitutional and are without the authority of law. *Id*. But for mixed-motive traffic stops, the legality is more nuanced. "[A] traffic stop is not unconstitutionally pretextual so long as investigation of either criminal activity or a traffic infraction (or multiple infractions), for which the officer has a reasonable articulable suspicion, is an actual, conscious, and independent cause of the traffic stop. . . . The trial court's inquiry should be limited to whether investigation of criminal activity or a traffic infraction (or multiple infractions), for which the officer had a reasonable articulable suspicion, *was an actual, conscious, and independent cause of the traffic stop*." *Id*. at 299-300 (emphasis added).

that's not the explanation that the jury got, and that is the problem. So I need to know what it is.

Please take the stand, Officer. I'm going to put an end to this, if it's what I think it is. Please take the stand. I'll remind you, you're still under oath.

RP at 118-19.

The trial court proceeded to question Schwalb about his stop of Rutledge. Schwalb stated that there were two reasons why he was interested in Rutledge: because he had reasonable suspicion that Rutledge had been in the park after closing hours and because of Rutledge's failure to stop at the stop line. According to Schwalb, these reasons were reflected in his report. Schwalb explained:

So we're authorized to stop people, identify people based on [being in the park after hours]. There's a high theft that happens in the area and what we've identified is people come in after hours. In order to stop that from happening we will cite and expel those people. So the initial reason, I saw the vehicle exiting, I was interested in it because I knew that it had not been in there and the second thing is I saw that it [had] not stopped at that traffic sign.

RP at 121. Schwalb saw Rutledge at the stop sign and made the decision to pull over Rutledge for being in the park after hours "at the same time." RP at 122. When the trial court asked Schwalb whether pursing people who are leaving the park after hours was "the real reason you pursued [Rutledge]," Schwalb responded, "My intention was to write and expel [Rutledge] with that, yes." RP at 122.

The trial court denied Rutledge's motion to dismiss. In doing so, the court explained that, while it had a "well-grounded . . . suspicion" that the stop was pretextual, Rutledge had the burden to overcome a presumption that the traffic infraction stop was legitimate and not pretextual. RP at 130. The court found that Rutledge failed to meet his burden but stated that it

was concerned that the jury did not get "the full picture": "The answer the Ranger gave me on the stand about the real [reason] why, I don't think all that was testified to in front of the jury." RP at 131-32. The court then stated that if Rutledge wished to call Schwalb it would give Rutledge "some latitude . . . [to] ask any manner of questions in that regard, it's going to be open – open season. It's going to be a field day. You are permitted to ask whatever you like in that regard." RP at 132.

In Rutledge's case in chief, he called Schwalb to testify about his decision to stop Rutledge:

> [RUTLEDGE]: And you were interested in finding out the—whether or not that— that vehicle was lawfully registered in the park; is that correct?
>
> [SCHWALB]: Yes.
>
> [RUTLEDGE]: And that was the real reason you were wanting to contact that individual, correct?
>
> [SCHWALB]: It was both of the stops together made that stop interesting to me.
>
> [RUTLEDGE]: But the primary reason was to find out if that vehicle was an unregistered person, correct?
>
> [SCHWALB]: The stop sign violation was the primary reason for the stop.
>
> THE COURT: Take the jury out.

RP at 154. The trial court indicated that it was "so close to throwing this out" because of Schwalb's inconsistent statements:

> THE COURT: Apparently this witness likes to give one answer to the Court and a different answer to the jury and that's misleading to the jury and I'm so close to throwing this out. I'm like—I'm almost there.
>
> . . . .

8

That is misleading. That is grossly misleading to the jury. It really is and it's not okay. This witness needs to get his story straight. And, quite frankly, at this point the credibility—I mean, your whole case is him. He testified he was your only witness and his credibility is in the toilet right now. So what reasonable—once the jury learns that he—I mean I [cannot] tell the jury—okay. What—let me ask you this. What do you want me to do?

. . . .

I'm not going to not tell the jury that he gave a different answer to the Court in private than he did to the jury. No way I'm allowing that. No way. That's misleading to the jury and it's perjury, by the way, under oath. And so they're going to know about that. So then the question then becomes what do you want me to do about it. Your case is based on this witness. The jury is going to realize he's got zero credibility. He's got zero credibility in my eyes. It's obvious what happened here. It's painful what happened here. The pretext on why this ranger went after Mr. Rutledge, it's obvious.

. . . .

    [THE STATE]: It's not obvious to the State, Your Honor. I'm having problems understanding. He gave you an answer that said that the stop was due to him leaving the park after hours because they were allowed to and the stop sign violation.

    THE COURT: No, no.

    [THE STATE]: He then testifies after that that it was simultaneously, because you asked him that question. . . . I don't believe we are there to where he is perjuring himself. I don't believe he's testifying inconsistently. I believe we're chopping up pieces of his—we're re-asking the same question multiple times and then we're chopping it up, picking it—

    THE COURT: Did he or did not—when asked the same question about his prior reason for the stop, did he or did not he not give two different answers? Because when I heard madam court reporter read back the answer he gave to that question when the Court asked it versus the answer he gave to the jury when [Rutledge's counsel] asked it, those two versions were not same. They were mutually exclusive, materially different, also known opposite.

    [THE STATE]: I believe that he keeps trying to tell everybody that the stop—the rolling stop where he did not stop at the stop sign and him noticing that the car had not been in the park earlier and he was stopping it for that reason, it was

happening simultaneous. That's what he testified to you earlier. We're cutting him off before he can finish the answer.

RP at 155-57.

The trial court ultimately reserved making any decision based on Schwalb's testimony "in the interest of moving [the case] along . . . it might be moot." RP at 167. It noted, "[d]epending upon the outcome, then we'll discuss the appropriate remedy at that time. . . . [If] the jury convicts, then we'll have a talk." RP at 168.

The jury found Rutledge guilty as charged. The trial court accepted the verdict. After retiring the jury, the trial court stated,

All right. So—so here's what I assume is going to happen. I assume you're going to need two dates. One date is going to be for any defense motion or argument regarding trial and I'm assuming there's going to be a motion—I don't know that, but that—that's the first order of business. And then we also should pick a sentencing date, just in case—in the event that sentencing becomes necessary, which is—at this point I presume that it is, depending upon the outcome of any motions.

RP at 216. The trial court then set two dates, one for a motion hearing and another for sentencing.

### III. POST-VERDICT DISMISSAL

Rutledge moved for an arrest of judgment under CrR 7.4(a), dismissal or a new trial under CrR 7.5(a)(7), or, alternatively, dismissal under CrR 8.3(b) for government misconduct. Among other things, Rutledge argued that his initial detention was not lawful because the stop was pretextual. Rutledge also argued that Schwalb gave false and misleading testimony which was material to the case and prevented Rutledge from having a fair trial. Rutledge moved to set

10

aside the jury's verdict and dismiss the case, contending that that State "failed to police their own witness from providing false testimony." CP at 40.

Attached to Rutledge's motion was a transcript of a pretrial interview of Schwalb and a copy of Schwalb's incident report. According to the transcript, Schwalb had told defense counsel in the interview that "the first thing . . . I was pretty aware that [Rutledge's vehicle] was not in [the park earlier and]. . . . [t]he second is it approached the stop sign and it did stop before it got out in the—in the highway. . . . [i]t did not stop at the stop, however. I felt like the vehicle slammed on its brakes." CP at 272-73. "So I decided at that point to pull him over. Ah, and I have to make a choice because I'm probably not going to write him for both things. Ah, but I'm going to pull him over for the—being in the park after hours." CP at 274. Schwalb explained he decided to pull Rutledge over "for the—being in the park after hours. . . . [b]ecause that's probably what's going to lead to [Rutledge] being cited and expelled. So, monetarily, it's not the worse offense, but that is the one that . . . fits our mission and what we're doing more." CP at 274.

In his report, however, Schwalb stated that he pursued Rutledge "to conduct [a] traffic stop" and notified dispatch that he was stopping Rutledge for "failing to yield." CP at 290. This was after Schwalb reported having activated his emergency lights, the vehicle did not activate its brake lights, it crossed the fog line, and it maintained its speed below the posted speed. Schwalb also described thinking that Rutledge could be intoxicated due to his failure to stop at the stop sign, among other driving behaviors. The incident report included a statement from Schwalb that he certified under the penalty of perjury that the report's statements were true and correct.

11

After a hearing on Rutledge's motion, the trial court entered written findings of fact and conclusions of law. The trial court found that, as a state actor, Schwalb lied in his testimony regarding the traffic stop and the State failed to correct his false testimony which the trial court relied on when it denied Rutledge's motion to dismiss at trial.

In finding of fact (FF) 6, the trial court found that Schwalb's "real motive" for the traffic stop was Rutledge's presence in the park after dark. CP at 331. In FF 7-9, the court found that Rutledge "was exiting the park conducting himself in a lawful fashion[, t]here was no evidence [Rutledge] had done anything wrong in the park or broken any laws before exiting the park[, t]he Ranger believed [Rutledge] was suspicious because he was exiting the park after hours[,] and the Ranger acted on a hunch." CP at 331-32.

Additionally, the trial court found:

10. The Ranger indicated to the jury that the Stop sign violation was the primary motive to stop the defendant. The Ranger previously told the Court the park violation after hours was the reason for stop because it would fulfill his mission to expel the defendant from the park.

11. This discrepancy put into issue The Ranger's credibility as the Court caught him lying on a material point.

CP at 332 (boldface omitted). In FF 12, the court then found that the stop sign violation was "0.00 percent of the motive to stop [Rutledge] after taking into consideration the entire context and the circumstances of the Ranger's testimony." CP at 332. In FF 16, it found that stopping Rutledge's vehicle "was pretextual without a sufficient legal basis." CP at 332.

Regarding Schwalb's credibility, the trial court found the following:

13. The Ranger was cagey with the court, He was inconsistent with his report, he was inconsistent between the Court and the jury, and he was inconsistent with the video.

12

14. He was inconsistent in every way you can be inconsistent.

15. There was nothing in his testimony, at least nothing material, that was corroborated by anything other than his own word. Which was proven or disproven.

CP at 332 (boldface omitted).

In FF 17, the trial court also found that Schwalb "lied about subsequent events leading up to [Rutledge's] arrest." CP at 332. In FFs 18 and 22-24, it found that Schwalb's testimony regarding the lawfulness of the arrest was undermined by video evidence, his testimony that he told Rutledge he was not free to leave was false, video evidence confirmed "conclusively [that] the Ranger did not tell [Rutledge] he was not free to leave before [Rutledge] exited the vehicle," and "[t]here was no evidence to corroborate the Ranger's claims that he gave [Rutledge] clear directives to remain in the vehicle and he was not free to leave." CP at 333. The trial court then found in FF 25-26, "[o]n the contrary, there was sufficient evidence to show the Ranger's testimony was false and inconsistent with the video[ and t]here was nothing in the Ranger's testimony, at least nothing material[,] that was corroborated by anything other than his word." CP at 333.

In FF 29, the trial court found that "[t]he jury got it wrong because it trusted the Ranger." CP at 333. In FF 27, 28, and 30, the court found that the State, also a state actor, failed to correct the false testimony which the jury also relied on. Lastly, in FF 30-32, instead of correcting in any way Schwalb's false testimony, the trial court found that "in fact the opposite occurred. . . . The State ran away from the lie and came up with a Cockamamie theory that had no support in the record to cover up the lie. . . . The State tried to cover up the lie, not correct it." CP at 333.

13

In conclusion of law (CL) 8, the trial court concluded that the stop sign violation was zero percent of Schwalb's motivation in stopping Rutledge and, thus, the stop was pretextual without sufficient legal basis. In CL 13 and 17, it concluded that Schwalb's uncorrected false testimony misled the jury, and the State was required to correct the false testimony but covered up Schwalb's lie instead with an unsupported theory. In CL 16, the court "[could not] say that had the lie been corrected by the State as was its duty, . . . the jury [could] have ignored the lie and reached the same verdict." CP at 335.

In CL 18, the trial court concluded that both Schwalb's lie and the State's cover up of the lie violated fundamental fairness. Lastly, in CL 19, it granted Rutledge's motion, "reversed" Rutledge's conviction, and dismissed the case with prejudice under to CrR 8.3(b) due to government misconduct. CP at 335. The trial court made no ruling whether dismissal or a new trial was warranted under CrR 7.4(a)(3) or CrR 7.5(a)(7).

The State appeals.

ANALYSIS

The State challenges the trial court's decision to reverse Rutledge's conviction and dismiss the case with prejudice pursuant to CrR 8.3(b) upon finding that government misconduct occurred.

I. LEGAL PRINCIPLES

Former CrR 8.3(b) permits a trial court to, "in the furtherance of justice, after notice and hearing, . . . dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's

14

right to a fair trial."[3]  The rule expressly provides that the trial court must "set forth its reasons in a written order."  Former CrR 8.3(b).

Our courts have long considered dismissal of charges to be "an extraordinary remedy." *State v. Baker*, 78 Wn.2d 327, 332, 474 P.2d 254 (1970).  To support dismissal, the defendant must show (1) "arbitrary action or governmental misconduct" and (2) "actual prejudice affecting [the defendant's] fair trial rights."  *State v. Oppelt*, 172 Wn.2d 285, 297, 257 P.3d 653 (2011).  The defendant must make such a showing by the preponderance of the evidence.  *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).  Governmental misconduct does not need to be of a dishonest or evil nature; "simple mismanagement is sufficient."  *State v. Blackwell*, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993); *see also Oppelt*, 172 Wn.2d at 297.

Appellate courts review a trial court's decision under CrR 8.3(b) for abuse of discretion. *Oppelt*, 172 Wn.2d at 297.  The trial court abuses its discretion if its "'decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.'"  *Rohrich*, 149 Wn.2d at 654 (quoting *Blackwell*, 120 Wn.2d at 830).  A trial court's decision is "based 'on untenable grounds' or made 'for untenable reasons' if it rests on facts unsupported in the record

---

[3] We cite to the court rule in effect at the time of the trial court's decision.  Effective September 1, 2025, CrR 8.3(b) now requires a court to consider the following factors, as well as "any other information the court believes is relevant," in considering whether to dismiss:

> (1) the seriousness and circumstances of the offense;
> (2) the impact of a dismissal or lack of dismissal on the safety or welfare of the community (the defendant is part of the community);
> (3) the impact of a dismissal or lack of dismissal upon the confidence of the public in the criminal justice system;
> (4) the degree and impact of the arbitrary action or governmental misconduct.

or was reached by applying the wrong legal standard." *Id.* (quoting *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995)).

And "[a] decision is 'manifestly unreasonable' if the court, despite applying the correct legal standard to the supported facts, adopts a view 'that no reasonable person would take,' . . . and arrives at a decision 'outside the range of acceptable choices.'" *Id.* (quoting *State v. Lewis*, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990); *Rundquist*, 79 Wn. App. at 793). Even if we find an abuse of discretion, "'[i]f we find Defendant raised and proved sufficient grounds for a CrR 8.3(b) dismissal, we must then affirm the trial court's dismissal of the charges.'" *Id.* (quoting *State v. Michielli*, 132 Wn.2d 229, 242-43, 937 P.2d 587 (1997)).

## II. TRIAL COURT'S PARTIALITY

The State argues that the trial court violated its duty to be impartial and abused its discretion in its repeated interventions and advocacy for the defense, thus invalidating its dismissal of the prosecution. We agree.

One of the oldest and most fundamental linchpins of the judiciary is fairness and the appearance of such. As described in one of our state's earliest reported cases:

> The principle of impartiality, disinterestedness, and fairness on the part of the judge is as old as the history of courts; in fact, the administration of justice through the mediation of courts is based upon this principle. It is a fundamental idea, running through and pervading the whole system of judicature, and it is the popular acknowledgment of the inviolability of this principle which gives credit, or even toleration, to decrees of judicial tribunals. Actions of courts which disregard this safeguard to litigants would more appropriately be termed the administration of injustice, and their proceedings would be as shocking to our private sense of justice as they would be injurious to the public interest.

*State ex rel. Barnard v. Bd. of Educ.*, 19 Wash. 8, 17-18, 52 Pac. 317 (1898). "[T]he virtue of a judge is seen in making inequality equal, that he may plant his judgment as upon even ground.

16

. . . '[N]ext in importance to the duty of rendering a righteous judgment, is that of doing it in such a manner as will beget no suspicion of the fairness and integrity of the judge.'" *Id.* at 18 (quoting *People v. Suffolk Common Pleas*, 18 Wend. 550 (1835)).

A judge must not only be impartial but also appear to be so. *State v. Solis-Diaz*, 187 Wn.2d 535, 540, 387 P.3d 703 (2017). Due process, the appearance of fairness, and the Code of Judicial Conduct[4] require disqualification, or recusal, of a judge who is biased against a party or whose impartiality may be reasonably questioned. *State v. Ra*, 144 Wn. App. 688, 704-05, 175 P.3d 609 (2008). A trial court violates due process when it advocates for a party. *State v. Moreno*, 147 Wn.2d 500, 509-11, 58 P.3d 265 (2002). A judge cannot "take charge of a party's case or . . . become a clear partisan." 5A KARL B. TEGLAND & ELIZABETH TURNER, WASHINGTON PRACTICE: EVIDENCE § 614.5 (6th ed.) (2024). Likewise, the trial court should not "enter into the 'fray of combat' or assume the role of counsel." *Ra*, 144 Wn. App. at 705 (quoting *Edege-Nissen v. Crystal Mountain, Inc.*, 93 Wn.2d 127, 141, 606 P.2d 1214 (1980)). Under the appearance of fairness doctrine, a judicial proceeding is valid only if "a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing." *Solis-Diaz*, 187 Wn.2d at 540.

This is an extraordinary case given the trial court's egregious conduct below. During trial and ultimately leading up to its CrR 8.3 decision, the trial court improperly injected itself into the "fray of combat" as an advocate for the defendant and assumed the role of defense counsel. *Edege-Nissen*, 93 Wn.2d at 141.

---

[4] *See* Canon Rule 2.11(A): "A judge shall self-disqualify in any proceeding in which the judge's impartiality might reasonably be questioned."

Upon the resting of the State's case in chief, the trial court, on its own accord, excused the jury and then questioned the State about its presentation of the case, stating that it was confused why the State was relying only on Schwalb's testimony. The trial court then steered the defense into a CrR 3.6 discussion regarding a pretextual motivation for the ranger's initial interest in Rutledge that the defense did not raise itself. In doing so, the trial court commented that "experience" informed the trial court that the jury was not getting "the whole story." RP at 115. Doubting Schwalb's versions of events and wanting "to put an end to this," the trial court then, on its own accord, recalled the ranger to the stand and interrogated him.[5] RP at 119.

In reviewing the trial court's questioning of Schwalb and its later declaration that it had a "well-grounded . . . suspicion" that the stop was pretextual, it is clear that the trial court's calling and interrogation of the ranger was based in its belief that the ranger was lying even though the ranger had testified there were two reasons he initiated the stop. RP at 130. While the trial court ultimately denied Rutledge's motion to dismiss at this point, the court told defense it was granted "open season . . . a field day" to re-examine and ask the ranger "any manner of questions" regarding his reasons for stopping Rutledge. RP at 132.

Then, after the jury returned, in the middle of defense's examination of Schwalb and after he responded to one of defense counsel's questions about his reason for stopping Rutledge, the trial court—without an objection or motion by a party—interjected itself and excused the jury for a lengthy colloquy with the parties. Given Schwalb's response to defense counsel's question, the

---

[5] Rutledge asks this court to strike the State's opening brief because he asserts that the brief is insufficient to merit judicial consideration. We disagree given a fair and complete review of the State's arguments and decline to strike the brief. *See also* RAP 1.2(c).

trial court believed that Schwalb was misleading the jury, had lied on the stand, and committed perjury.

To be sure, the evidence rules permit a trial court to, even on its own motion where necessary in the interests of justice, call witnesses. ER 614(a). And, while the trial court's questioning of witnesses when the jury is present "must be cautiously guarded so as not to constitute a comment on the evidence" as is barred under our state constitution, here the trial court interrogated the witness outside the presence of the jury. *See* ER 614(b); CONST. art. IV, § 16. However, the trial court's sua sponte interjection, at the minimum, interrupted the flow of testimony. And even interruptions in the trial alone can violate "the constitutional bounds of judicial comment" by indicating a court's train of thought:

> "Every lawyer who has ever tried a case, and every judge who has ever presided at a trial, knows that jurors are inclined to regard the lawyers engaged in the trial as partisans, and are quick to attend an interruption by the judge, to which they may attach an importance and a meaning in no way intended. It is the working of human nature of which all men who have had any experience in the trial of cases may take notice. Between the contrary winds of advocacy, a juror would not be a man if he did not, in some of the distractions of mind which attend a hard-fought and doubtful case, grasp the words and manner of the judge as a guide to lead him out of his perplexity. On the other hand, a presiding judge has no way to measure the effect of his interruption. The very fact that he takes a witness away from the attorney for examination may, in the tense atmosphere of the trial, lead to great prejudice."

*Edge-Nissen*, 93 Wn.2d at 141-42 (quoting *State v. Jackson*, 83 Wn. 514, 523, 145 P. 470 (1915)); *see also State v. Richard*, 4 Wn. App. 415, 425, 482 P.2d 343 (1971) ("If the trial record shows that the court by non-verbal conduct, such as his manner and tone in ruling or instructing the jury, conveys the trial court's personal opinion concerning the credibility of the witness or facts of the case, such conduct may properly be said to violate Const. art. 4, s 16.").

We expect trial court's conduct, including their rulings, "to be fair and impartial." *Edge-Nissen*, 93 Wn.2d at 140. In this case, the trial court's incomprehensible conduct leading up to its CrR 8.3 decision, demonstrated the judge's partiality as well as the judge's departure from fairness. Although all the conduct discussed above occurred prior to the trial court's CrR 8.3 decision, all instances developed and directly related to the trial court's eventual dismissal of the prosecution and its reasons for doing so.

Additionally, it was the trial court, and not any counsel, who first brought up possible post-trial motions after the jury returned its verdict. Despite the trial court allowing both parties to submit briefing and present oral argument regarding the post-trial motion, a reasonably prudent observer could still conclude that the post-trial motions hearing and the resulting ruling were tainted by partiality given the trial court's prior conduct. Considering the trial court's conduct leading up to and cumulating in its CrR 8.3 ruling, "a reasonably prudent, disinterested observer" would not have concluded that the parties received a fair, impartial, and neutral hearing. *Solis-Diaz*, 187 Wn.2d at 540. Through the trial court's flagrant interjection and advocacy during trial and by steering defense into a CrR 8.3 argument, the trial court acted partially and abused its discretion.

Concluding that an abuse of discretion occurred, we turn to whether we should nevertheless affirm the trial court's CrR 8.3(b) dismissal because such dismissal was based on Rutledge raising and proving "'sufficient grounds.'" *Rohrich*, 149 Wn.2d at 654 (quoting *Michielli*, 132 Wn.2d at 243). Here, Rutledge did not raise and provide sufficient grounds. Nearly every finding of fact and conclusion of law flowed from the trial court's conclusion that the ranger had lied. However, this conclusion was untenable and unsupported by the record.

20

During Rutledge's mid-trial motion to dismiss, the trial court asked Schwalb whether there was a basis separate from the stop sign violation for pursuing Rutledge. Schwalb stated that he was interested in Rutledge both for the stop sign violation and for suspicion that Rutledge was in the park after closing hours. Schwalb then admitted that his intention to write and expel Rutledge from the park for being there after hours was "the real reason" he pursued Rutledge. RP at 122. But not soon after, in front of the jury, Schwalb testified that his "primary reason" for stopping Rutledge was the stop sign violation. RP at 154.

In dismissing the prosecution under CrR 8.3(b), the trial court found in FF 6 that Schwalb's "real motive" for the traffic stop was Rutledge's presence in the park after dark. CP at 331. The court found that Schwalb's testimony regarding the "real reason" and "primary reason" for the stop "put into issue [Schwalb's] credibility as the Court caught him lying on a material point." CP at 332 (FF 10-11). In FF 29, the trial court found that "[t]he jury got it wrong because it trusted the Ranger." CP at 333. This appears to incorporate several other findings which found that the ranger lied or his testimony was proven or disproven through video or other evidence, or uncorroborated by any evidence other than his word. *See* FF 2-5, 7-14, 15-18, and 25-28, 30-33.

Substantial evidence does not support these findings of fact nor the trial court's other findings that the ranger lied. *See Lantz v. State*, 28 Wn. App. 2d 308, 319, 535 P.3d 501 (2023), *review denied*, 2 Wn.3d 1019 (2024) ("'Findings of fact made by the [trial] court are accepted if they are supported by substantial evidence in the record.'") (quoting *City of Richland v. Wakefield*, 186 Wn.2d 596, 605, 380 P.3d 459 (2016)); *State v. Koeller*, 15 Wn. App. 2d 245, 255, 477 P.3d 61 (2020) ("Substantial evidence supports a finding of fact where a sufficient

quantity of evidence exists to persuade a reasonable person of its truth."). Against the backdrop of Schwalb's entire testimony, Schwalb's two statements about the "real" and "primary" reasons for the stop does not amount to substantial evidence that Schwalb "lied particularly " especially considering the jury reached a jury's verdict and convicted Rutledge. [6] It was undisputed that Rutledge's daughter's video did not record the entire contact from the beginning of the contact, and the ranger also had indicated there were two reasons for his contact. Schwalb's testimony was grounds for impeachment only. Under these circumstances, the court usurped the jury's role. Thus, the trial court's finding that the ranger lied was untenable and unsupported by the record, and Rutledge failed to prove sufficient grounds to support his CrR 8.3 motion.

Considering the trial court's conduct in this case, the trial court's partiality warrants reversal. We conclude that the trial court's dismissal of the prosecution, including all its findings of fact and conclusions of law related to that decision, are invalid. Thus, we reverse the trial court's CrR 8.3(b) ruling.[7]

## CONCLUSION

Under these extraordinary circumstances, we reverse dismissal of the prosecution under CrR 8.3(b), reinstate the jury's verdict, and remand for sentencing.

---

[6] *See also State v. Avington*, 2 Wn.3d 245, 263, 536 P.3d 161 (2023) (reaffirming that, in a jury trial, members of the jury and not the trial judge are the sole and exclusive judges of the evidence). We recognize that under other circumstances, it may lead to a different conclusion.

[7] The State also argues the trial court inappropriately substituted its credibility assessment of Schwalb for the jury's credibility assessment. Because we reverse on other grounds, we do not reach this argument.

No. 59684-9-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Maxa, P.J.

Cruser, J.